In re BRANIFF AIRWAYS, INCORPORATED et al., Debtors.

BRANIFF AIRWAYS, INCORPORATED; Air Line Pilots Association, International; Braniff Airways Incorporated, Retirement Plan for Pilots, Part A; Dale States, Jack Boisen, John Skiba, and Richard Russell, constituting the Retirement Board of Braniff Airways, Inc., Retirement Plan for Pilots, Part A, Plaintiffs,

v.

BANKERS TRUST COMPANY, as Trustee; and W.P. McDonald, V.A. Cebell, III, N.G. Robinson, and V.H. Quattlebaum on their own behalf and on behalf of all Plan Beneficiaries, Defendants.

Bankruptcy No. 482–0369.

Adv. No. 482–0337.

United States Bankruptcy Court, N.D. Texas, Fort Worth Division.

Dec. 23, 1982.

---

See also, Bkrtcy., 24 B.R. 466.

David Bonderman, K. Peter Schmidt, Arnold & Porter, Washington, D.C., Robert Savelson, Barbara Mehlsack, Cohen, Weiss & Simon, New York City, for plaintiffs.

Warren W. Shipman, III, Mike Hunter, Godfrey, Decker, McMarkin, Shipman, McClane & Bourland, George A. Crowley, Kevin Kuenzli, McDonald, Sanders, Ginsburg, Phillips, Maddox & Newkirk, Fort Worth, Tex., Charles Plenge, Johnson, Bromberg & Leeds, James Hicks, Hal Gillespie, Hicks, Gillespie & James, P.C., Raymond B. McCoy, Dallas, Tex., Henry Rose, Mitchell Strickler, Lawrence F. Landgraff, Ken Cprek, Pension Guaranty Corp., Washington, D.C., for defendants.

## MEMORANDUM OPINION

JOHN FLOWERS, Bankruptcy Judge.

This case involves several issues concerning the Braniff Airways Incorporated Retirement Plan for Pilots, Part A ("Plan"). The debtor brought this action pursuant to § 4048 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1348, seeking a court ordered date for termination of the Plan. The debtor also requested instructions as to its fiduciary responsibilities pursuant to § 502 of ERISA, 29 U.S.C. § 1132. The case has been certified as a class action and the named defendants are representatives of their respective classes. This court has jurisdiction under 28 U.S.C. § 1471.

The issues before the court are: the date of plan termination; whether certain participants are entitled to lump sum distributions from the Plan; whether a group of participants, who became employees of the debtor by reason of a merger of the debtor with Pan American-Grace Airways, Inc. ("Panagra"), are entitled to segregation of specific assets which were transferred to the plan from the Panagra retirement plan;

and the effective date for determining participants' marital status for purposes of certain actuarial calculations.

BACKGROUND

For many years the debtor has maintained a pension plan for its pilots. The plan in question is a defined benefit plan providing specific benefits to be paid to plan participants. As such it is subject to the provisions of ERISA. 29 U.S.C. § 1321. The Plan was originally established in 1957. Prior to January 1, 1967 participation was voluntary and participants' contributions were made with their after-tax earnings. In 1967 all pilots with one year of service automatically became participants and contributions to the Plan were no longer deducted from their earnings. Thereafter all contributions were made by the debtor for each participant but a portion, namely the "deemed employee contribution", was treated as if each participant had made it. The "deemed employee" contributions were calculated on the participant's earnings, and credited to an account maintained for each participant known as his Contribution Account A ("Employee Contribution Account"). Participants did not pay income taxes on these contributions. A small group of pilots participated in the plan prior to 1967 and they undisputedly have benefits derived from contributions made from their after tax earnings. The debtor was required to make such additional contributions as necessary to provide the promised benefits and satisfy the minimum funding requirements established by the Internal Revenue Code. The only other source of plan funding has been from earnings on plan investments.

Participants' interests in the Plan are expressed in terms of "Accrued Benefits". Total Accrued Benefits are computed by means of a mathematical formula based upon a hypothetical retirement income for each participant. The Employee Accrued Benefit is also calculated by a formula using the respective Employee's Contribution Account as its base.[1] The Employer Accrued Benefit is calculated by subtracting the Employee Accrued Benefit from the Total Accrued Benefit. All participants are fully vested at all times in their Employee Accrued Benefit. They become 50% vested in their Employer Accrued Benefit after five years service, acquiring an additional 10% for each additional year of service.

A participant's right to be paid from the fund is dependent upon his length of service. Participants with less than five years service are only entitled to a lump sum payment equal to the amount of their Employee Contribution Account upon final termination of employment. Those participants with five years or more service are entitled to receive a retirement income expressed as a percentage of certain earnings. They also have the right to elect a lump sum distribution equal to their Employee Accrued Benefit in the event of termination of employment. This election must be made before retirement and it reduces their future retirement income to the vested portion of their Employer Accrued Benefit.

The plan does not contain any specific provisions regarding the plan administrator's duties in a situation as is presented here. Section 19.4 of the plan generally provides that in the event of plan termination all assets shall be distributed in accordance with § 4044 of ERISA.

The debtor employed 1,966 pilots who were plan participants, some of whom were on furlough, when on May 12, 1982 it ceased all operations and notified all employees they were terminated. On May 13, 1982, the debtor filed a petition under Chapter 11 of the Bankruptcy Code. Throughout the summer the debtor discussed the status of the plan with the Pension Benefit Guaranty Corporation ("PBGC"). During this time several participants, some with less than five years service requested lump sum payments. These requests were processed but not paid, although all monthly retirement benefits continued to be paid at promised

---

1. These are different expressions of the same value. When referred to as the Employee's Contribution Account it is expressed as a lump sum and when referred to as the Employee's Accrued Benefit it is expressed as an annuity.

levels. On August 20, 1982 the plan administrator notified all participants of its intent to terminate the Plan retroactively as of May 12, 1982. Simultaneously the plan administrator brought this action.

The Plan does not have adequate assets to pay all participants at promised levels. Under ERISA a plan is considered "sufficient" for PBGC guaranty purposes if it has assets adequate to pay the first four priority categories set forth in the statute even though it may not be able to pay all promised benefits. The Plan here meets that test of sufficiency and has assets to meet some but not all fifth priority liabilities. No sixth priority liabilities will be paid. After a preliminary hearing on August 26 and 27, the level of retirement benefits being paid to retirees was ordered reduced to PBGC minimums and lump sum distributions enjoined. Because it is short of assets, lump sum distributions will have the effect of exacerbating the reduction of benefits for all other participants while giving the lump sum claimants with less than five years service full payment of their promised benefits. Those participants with more than five years service would receive full payment of the employee accrued benefit portion of their promised benefit.

ERISA, which became effective in 1974, was enacted to provide some measure of security to pension plans. Under its provisions a plan may be terminated at any time. 29 U.S.C. § 1341. The termination procedures of ERISA have been the subject of analysis in a companion case involving the pension plan of the debtor's management employees. See my memorandum opinion of November 9, 1982, in adversary number 482–0339. In cases as here, where a plan is sufficient, ERISA provides for the plan administrator to conduct the dissolution of the Plan. 29 U.S.C. § 1341(a). Plan assets are to be allocated to participants depending upon where various parts of their respective benefits fall within the system of priority levels established in the statute. Funds contributed by participants have the two highest priorities, followed by retirement income to those actually retired or eligible for retirement three years prior to plan termination. The fourth priority category is composed of all other benefits guaranteed by the PBGC. The fifth is all other benefits which are non-forfeitable under the plan. The final category is any remaining plan benefits. Plan assets are to be used to pay all claimants in the highest priority category in full before proceeding to the next lower one. If the assets are insufficient to completely compensate all participants for the value of their benefits within a particular category they are allocated on a pro-rata basis. See 29 U.S.C. § 1344. The customary method for distributing the assets is to purchase commercial annuities. A participant may have benefits which fall into more than one of the priority categories. In summary, a participant's benefits under the plan are categorized into the statutory priorities, valued, and then distributed by purchasing an annuity of which the participant is the beneficiary. Typically, the annuity has several settlement options.

TERMINATION DATE

Since ALPA, the bargaining agent for the pilots, and the debtor agree the plan should be terminated it is not necessary to address the issue of whether the terms of the collective bargaining agreement preclude termination.

On the question of plan termination I have previously ruled, in the companion case involving the debtor's management plan, that where, as here, a plan is sufficient under ERISA it cannot be terminated earlier than ten days after notice of termination is given to all participants. See 29 U.S.C. § 1341. In this case that notice was given on August 20, 1982, and accordingly I set the termination date of the Plan to be August 30, 1982.

LUMP SUM CLAIMS

The selection of August 30 as the termination date makes relevant for discussion the claims of some participants for lump sum distributions. Those claimants fall into two general categories, those participants having less than five years service and those with more. Those with less than five years service point out that their employ-

ment was terminated on May 12 and the Plan continued in effect until August 30. They rely upon section 10.4 of the Plan which provides for a lump sum distribution in an amount equal to the Employee Contri-bution Account for any participant termi-nated short of five years service. Those with more than five years service rely upon their right under section 10.5 of the Plan to elect to receive a lump sum distribution equal to their Employee Accrued Benefit upon termination of their employment. As noted earlier, the Plan provides the latter group must receive a reduced retirement income in the event of a lump sum distribu-tion.

The debtor, the PBGC and all other par-ties object to any lump sum distributions because they would constitute a distribution in anticipation of plan termination which violates both the ERISA mandated system of priorities and regulation 2618.4(b) of the PBGC. The pertinent portions of the regu-lation provide:

> (b) Distributions in anticipation of termi-nation. A distribution, transfer, or allo-cation of assets to a participant or to an insurance company for the benefit of a participant, made in anticipation of plan termination, is considered to be an alloca-tion of plan assets upon termination, and is covered by paragraph (a) of this sec-tion. In determining whether a transfer, or allocation of assets has been made in anticipation of plan termination PBGC will consider all of the facts and circum-stances including—
> (1) Any change in funding or operation procedures;
> (2) Past practice with regard to employee requests for forms of distribution;
> (3) Whether the distribution is consistent with plan provisions; and
> (4) Whether an annuity contract that provides for a cutback based on the guar-antee limits in Part 2621 of this chapter could have been purchased from an insur-ance company.

29 C.F.R. § 2618.4(b) (1981).

The lump sum claimants respond that distributions in anticipation are prohibited in instances where collusion exists between the plan administrator and some plan par-ticipants. They correctly point out there is no evidence of collusion here. This view of the regulation is too narrow although cer-tainly that would be prohibited. It is ap-parent from §§ 4044 and 4045 of ERISA, 29 U.S.C. § 1344, 1345, that Congress estab-lished certain priority policies regarding protection of pension plan benefits. Those priorities, as described earlier, are found in § 4044. Section 4045 provides for recap-ture of certain distributions made within three years of plan termination which result in a distribution contrary to the statutory scheme, regardless of intent. The regula-tion merely expresses that which is implied by the statute.

■ The purpose of the Regulation is to maintain the respective positions of the par-ticipants in a plan's assets and prevent a run on the bank. This purpose is best served by interpreting the Regulation to prohibit claims for distribution which are made at a time the participants know or should know that plan termination is a like-ly prospect. Because of the nature of pen-sion plans, where each individual has a dif-ferent interest, it may be impossible to fashion a rule to cover all situations and some windfalls may be inevitable. The dis-cretionary recoupment provisions of § 4045 of ERISA also provide a means to address this problem.

■ An examination of the facts is nec-essary to ascertain if the lump sum claims are made in anticipation of termination. As noted, the test is an objective one based upon all the facts and not a subjective one based upon statements of intention of the particular participants involved.

The facts here reveal that the debtor ceased operations and gave notice of termi-nation of employment to all of its employ-ees on May 12, 1982. Uncashed pay checks were not honored thereby leaving all em-ployees unpaid for the last payroll period. On May 13, after the debtor filed its peti-tion for reorganization under the bankrupt-cy laws, its chief executive officer publicly

stated Braniff was "dead", advised former employees to seek other employment and stated that pensions might be reduced. These statements were widely circulated by the news media. On June 10, ALPA notified all of its members of potential problems with their pension plans.

Referring to the circumstances mentioned in the regulation as being relevant, it appears that as of May 12, 1982, a change in funding had occurred in that Braniff was no longer operating or funding the Plan and would not likely be able to do so in the future. The evidence revealed that historically there had been very few applications for lump sum distributions even with numerous participants on furlough in recent years. In the two months following the filing of the bankruptcy case 155 lump sum applications were filed. An additional 32 were filed after August 20, 1982. At time of trial 144 remained pending, the others having been withdrawn. The requested lump sum distributions, while authorized by plan provisions in ordinary situations, are contrary to the plan administrator's duty not to discriminate in favor of any group of participants in the extraordinary situation presented here. 29 U.S.C. § 1344. This same responsibility is also found in § 13.1 of the Plan. I find the requests for lump sum payments were made in anticipation of termination of the Plan.

The lump sum claimants cite PBGC Op. Letter No. 78–24 in which it was held that death benefits due a participant who died two years prior to a plan termination date must be paid in a lump sum before the § 4044 allocation of assets is undertaken. From this the lump sum claimants reason that their claims are not made in anticipation of termination because before termination occurs funds must be allocated to satisfy obligations arising prior to the termination date. They assert that one of those obligations is their lump sum claims. This argument is wide of the mark. The issue remains one of distribution in anticipation of termination. It is difficult to see how a lump sum claim that arises by reason of the death of a participant can ever be one in anticipation of termination.

Finally, these claimants assert that payment of the lump sums they seek would not be in violation of the ERISA priority scheme and thus not be subject to the rule prohibiting distribution in anticipation of termination. They claim they fall into the second priority category, which is the highest priority category applicable to any participant's benefits, and there are sufficient assets to pay this category in full, including all lump sum claims. Priority category two of ERISA provides:

(a) . . .

(2) Second, to that portion of each individual's accrued benefit which is derived from the participant's mandatory contributions

. . . . .

29 U.S.C. § 1344(a)(2)

The lump sum claimants argue that the benefits which they seek are derived from their mandatory contributions. They claim these contributions were part of their wages and it makes no difference that they were not taxed on them. In support they cite § 414(h) of the Internal Revenue Code which provides that "... *for purposes of this title* any amount contributed ... to an employee's trust described in § 401(a) shall not be treated as having been made by the employer if it is *designated* as an employee contribution." (Emphasis added).

Section 414(h), is expressly limited to Title 26, the Internal Revenue Code. Moreover, it does not provide such designated contributions shall be treated as employee contributions but rather that they shall not be treated as employer contributions. To interpret it to convert employer contributions into employee contributions for purposes of § 1344 of Title 29, ERISA, would upset the carefully considered Congressional policy of priorities and extend § 414(h) beyond its purpose and context.

Section 6.1(b) of the Plan provides:

Effective January 1, 1967, no regular contribution under this Sub-section 6.1, payable to Trust Fund A, will actually be deducted from the Participant's Earn-

ings. For the purposes of Sub-Section 6.2, however, it shall be assumed after such date that each Participant has made a monthly contribution to Trust Fund A of an amount determined under the foregoing Sub-paragraphs (a) and (b). The affect of the preceding sentence is to provide for each Participant, beginning January 1, 1967, cash vesting for purposes of refunds at death and termination, in Company contributions to Trust Fund A of amounts equal to the contributions described in the foregoing Sub-paragraphs (a) and (b).

The express purpose of this section is to provide for "cash vesting" of certain plan contributions even though made by the employer and not to change the priority scheme of § 1344. Section 6.1 does not designate the contributions as employee contributions. The legislative history of § 414(h) states that its purpose is to give "... effect to the source of contributions, as designated in the plan." H.R.Rep. No. 97–807, 93rd Cong., 2nd Sess. 145, U.S.Code Cong. & Admin.News 1974, pp. 4639, 4810. I hold that priority category two of § 1344 is limited to after tax earnings contributed by a participant and only those benefits in that category are entitled to lump sum distributions. The effect of holding as urged by the lump sum claimants would be devastating to the priority scheme of ERISA because it would elevate benefits of younger workers who have not yet retired over those of retirees. A result clearly contrary to Congress' intent.

█ The remaining question concerns which priority category applies to the benefits of the lump sum claimants with less than five years service. Under § 19.8 of the Plan they are non-forfeitable. I have held that they are not category two benefits and, because they are not payable as an annuity to a participant eligible to retire within three years of termination, I hold that they are not category three benefits.

**2.** Benefits in any category are offset to the extent they fall within a higher priority category.

Priority category four of ERISA includes all other benefits whose payment is guaranteed. 29 U.S.C. § 1344(a)(4). Section 1322(b)(3) which guarantees benefits, limits the guaranty to those having an actuarial value which does not exceed a specified cap. The PBGC argues that a benefit must be an annuity in order for it to fall within priority category four. The statute does not contain this requirement and the PBGC's argument is based upon §§ 2613.2 and 2613.3 of their Regulations which define guaranteed benefits to be pension benefits, i.e. an annuity. Since no party challenges this position, it is not necessary that I rule on the validity of the Regulation and I will assume for purposes of this opinion that a benefit must be an annuity to be within priority category four.

Although the only right of the lump sum claimants with less than five years service is to receive a single payment upon termination of service, section 10.1 of the plan defines their Total Accrued Benefit in terms of an annuity. Their rights are to receive a lump sum portion of their Total Accrued Benefit. I hold the lump sum claimants' benefits, which are expressed as an annuity in the Plan (the Employee Accrued Benefit), fall within priority category four of § 1344.[2]

█ In its brief, the PBGC raises a question regarding a residual value of the lump sum claims and into which priority category that residue would fall. Their position apparently is based on the fact the Plan provides a conversion rate utilizing a 5% interest factor which is substantially below current market rates and conversion into current market values will produce higher values. That is true for all benefits in the Plan. My holding that lump sums are expressed as an annuity under the Plan is solely for the purpose of determining into which priority category the lump sum benefits belong. A lump sum which is converted into an annuity is equal to the lump sum so long as the conversion factors (interest

rate and time) remain constant. It therefore has no residual value. The fact the lump sum may have a higher value on the commercial market than its value computed with plan factors is not relevant in determining its priority category.[3]

## PANAGRA

■ At the time the debtor merged with Panagra in 1967, Panagra had a pension plan for its pilots. Under the merger agreement the Panagra plan was merged into the Braniff plan effective January 1, 1968. Assets from the Panagra plan were used to purchase a commercial annuity to provide the employee accrued benefits of all Panagra pilots. All assets of the Panagra plan in excess of those used to purchase the annuity became part of the debtor's plan and the Panagra plan ceased to exist. One of the merger terms was that all Panagra pilots became members of the Plan and were given credit for their service with Panagra. Since 1968 the Panagra pilots have accumulated additional benefits under the Plan by reason of their increased years of service and because of periodic increases to the benefits in the Plan. All Panagra pilots will therefore receive benefits in excess of those in the Panagra plan. The annuity alone is insufficient to pay these increased benefits to the Panagra pilots. The Panagra pilots seek to have this annuity segregated for their exclusive benefit and participate in the allocation of the other plan assets. To grant the Panagra pilots' request would effectively give them a proportionally greater share of plan assets than the other participants. This, of course, disrupts the allocation priorities of § 1344. The evidence is undisputed that the Panagra pilots will receive more in the allocation process by treating the annuity as part of the Plan's assets than they would receive under the annuity alone. They have demonstrated no inequities because of their position. On the other hand, it would be inequitable to all other participants to give the Panagra pilots preferential treatment. The fact that a portion of the Plan's assets is the annuity purchased with the Panagra plan's assets is immaterial. See Treas.Reg. § 1.414(1)–1(b)(1). Participants' of defined benefit plans have rights to defined benefits from the entire unallocated trust fund, not from specific plan assets. The Panagra pilots' claim to specific plan assets will be denied.

## MARITAL STATUS

■ Section 9.4 of the plan provides a retirement income benefit in the form of an annuity to eligible spouses who survive participants. This is a "subsidized" benefit as the plan rather than the individual participant bears the cost.[4] The Plan defines an "eligible spouse" as one that was legally married to the participant at the time of the participant's death and for at least the prior twelve months. Not all participants are married. The marital status and identity of the spouses of any participant may change before their death. Therefore, at this time, it is impossible to ascertain the identity and age of "eligible spouses". Because commercial annuities are priced on an actuarial basis, the plan administrator has been unable to obtain any bids for such annuities as a result of its inability to furnish prospective bidders with actuarial data on participants' "eligible spouses". As a solution, the plan administrator has proposed that the court modify the definition of "eligible spouses" and limit it to spouses married to participants at the date of plan termination, which I have established as August 30. Such a change will affect three groups of participants: (1) Those who are single on August 30 and married at the time of their death; (2) those who are mar-

---

**3.** Perhaps, under some circumstances it could be argued that the *right* to claim a lump sum is a benefit having a value in addition to the actual lump sum. That argument has no application here because of my holding that no right to a lump sum payment exists upon termination.

**4.** A "non-subsidized" survivorship benefit is one where the participant, usually through a reduction in their annuity, bears the cost of the benefit.

ried on August 30 but are remarried to a younger spouse at the time of their death; and, (3) those who are married on August 30 but are remarried to an older spouse at the time of their death. Group three suffers no adverse consequences as a result of the proposed solution. Group two's adverse consequences will depend upon the age difference of the respective spouses. The actuary testified there would be little impact on the first group, those single on August 30 and married at the time of their death, because of the manner in which the calculations are made to value a participant's benefits. Benefits of single participants are given a higher value than married ones because of this survivorship feature. In the actuary's opinion this would approximately offset any inequality of treatment in most cases. None of the parties objected to this modification, but no one agreed to it, therefore leaving it for the court to decide. This problem was not contemplated when the plan was written. On the basis of the need for such modification and the general lack of inequities caused by it I will order the modification proposed by the plan administrator. This ruling does not preclude any participant from arranging for a non-subsidized survivorship benefit upon such terms as may be negotiated with the insurance carrier providing the annuity.

During trial a question arose as to the sufficiency of the notice given all class members and whether they were given adequate notice of the issues relating to the Panagra pilots and the surviving spouses. In the interest of due process the debtor will send another notice to all class members advising them of the existence of these issues. On those two issues I will enter an order which will be conditioned upon consideration of any interests that may arise as a result of the notice. On all other issues I will enter a final order.