645 F.Supp. 1486 (1986)
J. Robert VICTOR, et al., Plaintiffs,
v.
HOME SAVINGS OF AMERICA, et al., Defendants.
No. 85-239C(1).
United States District Court, E.D. Missouri, E.D.
October 20, 1986.
*1487 *1488 Daniel G. Tobben, St. Louis, Mo., for plaintiffs.
Kenneth F. Teasdale, Richard B. Scherrer, Clark H. Cole, St. Louis, Mo., for defendant Lincoln Nat. Life Ins. Co.
Charles A. Newman, Edward A. Scallet, St. Louis, Mo., for defendant Hamiltonian Fed., etc., and Home Sav. of America.

MEMORANDUM
NANGLE, Chief Judge.
This case is now before the Court on the cross-motions of the parties for summary judgment. Briefly, plaintiffs allege wrongful reduction of their pension benefits. They seek recovery of unpaid benefits, punitive damages, and attorneys' fees. Defendants have counterclaimed, alleging that plaintiffs breached their fiduciary duties. Defendants also seek a declaratory judgment. This Court grants defendants summary judgment on plaintiffs' complaint and grants plaintiffs summary judgment on defendants' counterclaims for breach of duty but not on the declaratory judgment counts.

I.
The parties have filed a joint stipulation of facts, which is summarized below. In 1955, Hamiltonian Federal Savings and Loan (Hamiltonian) established its first pension plan, known as the Hamiltonian Federal Savings and Loan Association Revised Pension Trust (the Plan). The Plan is a single-employer, defined benefit plan. Initially, Hamiltonian contracted with Aetna Insurance Company to provide services for the Plan but subsequently replaced Aetna with Lincoln National Life Insurance Company (Lincoln National). Plaintiff J. Robert Victor served as president of Hamiltonian for more than 20 years until his retirement on July 31, 1981. Victor also served as a director of Hamiltonian for more than 20 years until December, 1981. Plaintiff James J. Devereux was Hamiltonian's chief loan officer from 1966 until his retirement on June 30, 1981. Devereux also served as a director of Hamiltonian from 1955 until December, 1981. At the time of their retirement, plaintiffs were among the 25 highest paid employees of Hamiltonian. Upon retirement, both plaintiffs received certificates from Lincoln National setting out the form of benefit payments: Beginning on their retirement dates, plaintiffs were to receive monthly payments for life, with a guaranteed minimum of 240 monthly payments to be made to plaintiffs or their beneficiaries. Upon retirement, Victor began receiving benefits of $4,528.13 per month; Devereux began receiving $4,339.74 per month.
The terms of the Plan are set out in the Hamiltonian Federal Savings and Loan Association Revised Pension Trust Agreement. *1489 According to the terms of the agreement, the Plan is to be administered by a trustee. Three individuals have served as trustees of the Plan: Jay Lartonoix, Thomas Terneus, and Herbert Bryant. As administrator of the Plan, Hamiltonian prepared and distributed a summary plan description.
In 1976, the Plan was substantially amended to comply with the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1381 (1984) (ERISA). At that time, the Plan changed from Aetna to Lincoln National. The terms of the agreement between Lincoln and the Plan are contained in the Group Annuity Contract (GAC). Under the terms of the Plan effective on January 1, 1976, Plan participants were entitled to 40% of the average monthly compensation received by the participant during the five consecutive calendar years in which the participant had the highest aggregate compensation. On August 28, 1978, the Plan was amended to increase the monthly pension from 40% to 50% of the average monthly compensation. On June 13, 1979, a second amendment, effective on January 1, 1979, allowed employees to retire at age 60 without actuarial reduction for early retirement. One week later, the Plan was again amended, this time to bring its terms into conformity with ERISA amendments. On June 10, 1981, the Board of Directors of Hamiltonian approved a fourth amendment to the Plan, increasing benefits to 60% of monthly compensation.
Hamiltonian retained the accounting firm of Peat, Marwick, Mitchell & Co. (PMM) to advise it regarding plaintiffs' benefits. At a meeting on April 17, 1981, PMM explained that recent amendments to the Plan had increased benefits and that, as a result, an IRS rule would require plaintiffs to provide collateral for any lump sum benefits they received. As PMM explained, the purpose of the IRS rule was to prevent discrimination in the event of early termination of the Plan. PMM further explained that if the Plan were underfunded at termination, plaintiffs might forfeit their collateral to provide compensation for rank and file employees.
From 1979 to 1981, the savings and loan industry as a whole experienced financial difficulties. In particular, Hamiltonian reported a net loss for the year ending June 30, 1981, a loss which reduced Hamiltonian's net worth below the minimum required by the Federal Home Loan Bank Board. During this same period, Home Savings of America (Home Savings), a California-based savings and loan association, sought to expand into other states. On December 17, 1981, the Federal Home Loan Bank Board approved a two-step merger. In the first step of the transaction, Hamiltonian merged into Southern Federal Savings and Loan Association of Broward County, Florida. Next, the merged institutions merged into Home Savings. As a result of the mergers, Home Savings assumed responsibility for administering the Hamiltonian Plan.
After the merger, Home Savings decided to terminate the Hamiltonian Plan. On August 25, 1982, Home Savings initiated the termination process by filing a notice of intent to terminate with the Pension Benefit Guaranty Corporation (PBGC). The PBGC set the termination date of the Plan for September 18, 1982, ten days after the receipt of notice by the PBGC and the Plan participants.
Home Savings retained Martin Zigler of the St. Louis office of Tillinghast, Nelson & Warren (TNW), an actuarial firm, to assist in the termination. TMW contacted Lincoln National and discovered that the Plan would be underfunded at the time of termination: The Plan contained insufficient assets to fund all benefits; if plaintiff's benefits were fully funded, there would be insufficient assets to fund the benefits of other participants up to PBGC-guaranteed levels. On April 25, 1983, Zigler wrote to Home Savings to inform it of Lincoln National's assessment that the Plan was underfunded. Home Savings then consulted Gibson, Dunn & Crutcher, a law firm, for legal advice with respect to the Plan. After receiving the advice of its attorneys, Home Savings, as Plan administrator, began the allocation process of Title IV of ERISA by instructing Lincoln National to *1490 reduce plaintiffs' benefits. Lincoln National agreed to reduce plaintiffs' benefits but indicated that it wanted plaintiffs to return the certificates they had been issued at retirement. In February, 1984, an attorney for Home Savings sent a letter to the plaintiffs, explaining his interpretation of the ERISA allocation rules and asking for return of the certificates. Victor responded by asking several questions which the attorney answered in another letter dated March, 1984. Plaintiffs still refused to return the certificates. Home Savings then filed suit in this Court to enforce its interpretation of the allocation rules of ERISA. Lincoln National was notified of the suit but was not served; plaintiffs were neither notified nor served. Home Savings dismissed the suit when Lincoln National agreed to reduce plaintiffs' benefits, a reduction which began with the July 1984 benefit check.
On June 26, 1984, the PBGC issued a formal notice of sufficiency of Plan assets. In September 1984, the actual distribution of Plan assets occurred. Due to uncertainty concerning Lincoln National's valuation of the assets, TNW distributed benefits only through the level guaranteed by the PBGC. As a result, Lincoln National still holds Plan assets. On August 1, 1985, the value of these funds was $177,987.07.

II.
Under Rule 56 of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment if he can "show that there is no genuine issue as to any material fact and that [he] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). See also Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). In passing on a motion for summary judgment, a court is required to view the facts and inferences that may be derived therefrom in the light most favorable to the non-moving party. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir.1983); Vette Co. v. Aetna Casualty and Surety Co., 612 F.2d 1076, 1077 (8th Cir.1980). The burden of proof is on the moving party and a court should not grant a summary judgment motion unless it is convinced that there is no evidence to sustain a recovery under any circumstances. Buller, 706 F.2d at 846. However, under Rule 56(e), a party opposing a motion for summary judgment may not rest upon the allegations of his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); Celotex Corp. v. Catrett, ___ U.S. ___, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); see also 10A Wright, Miller and Kane, Federal Practice and Procedure, § 2739 (1983). In disputes involving the interpretation of unambiguous contracts, the Eighth Circuit has consistently upheld the appropriateness of summary judgment. Howard v. Russell Stover Candies, Inc., 649 F.2d 620, 623 (8th Cir.1981).
The myriad of legal questions presented by this case may be reduced to two principle issues. First, were plaintiffs' benefits reduced properly under the ERISA scheme for allocation of benefits at Plan termination. Second, does Home Savings or Lincoln National have a contractual or statutory obligation to fully fund plaintiffs' pension benefits under the Plan.

A. ERISA claims against Home Savings and the Hamiltonian Plan.
Regarding Home Savings and the Plan, plaintiffs present two claims under ERISA. In Count I, plaintiffs seek to recover benefits allegedly owed by Home Savings and the Plan under the fourth amendment to the Pension Trust Agreement. In Count XIII, plaintiffs allege that Home Savings breached its fiduciary duties by failing to pay plaintiffs' benefits and by inducing Lincoln National to reduce those benefits. Home Savings and the Plan admit that plaintiffs' benefits were reduced but argue that the reduction was required by IRS regulations and Title IV of ERISA. The propriety of the reduction turns on the interpretation of a PBGC regulation promulgated under ERISA.
ERISA is a "comprehensive and reticulated statute", intended by Congress to ensure the soundness and stability of employees' pension funds. Nachman Corp. v. PBGC, 446 U.S. 359, 361, 374, 100 S.Ct. *1491 1723, 1726, 1732, 64 L.Ed.2d 354 (1980). Prior to the passage of ERISA, employees were often denied benefits when their pension plan terminated with insufficient assets. ERISA protects pension benefits by providing minimum funding standards and establishing plan termination insurance. 29 U.S.C. § 1082 and §§ 1301-68. The insurance program operates in conjunction with the detailed rules for plan terminations. Under Title IV of ERISA, an employer may terminate a plan at any time. Upon termination, the employer incurs liability up to the level of benefits guaranteed by the PBGC; however, the liability may not exceed 30% of the employer's net worth. Up to certain limits, the PBGC pays any deficiencies from the PBGC insurance fund financed by premiums from participating pension plans. As explained below, the employer may incur additional liability if it has contracted to pay benefits beyond the PBGC-guaranteed level.
Section 4044 of ERISA, 29 U.S.C. § 1344, provides a scheme for allocation of plan assets upon termination. If plan assets are less than the actuarial present value of accrued benefits, § 4044 assigns priorities to categories of benefits to guarantee equitable treatment for all participants. In re Braniff Airways, Inc., 27 B.R. 222, 226 (Bankr.N.D. Texas 1982). To paraphrase § 1344, benefits are allocated in the following order:
1. Benefits attributable to voluntary employee contributions;
2. Benefits attributable to mandatory employee contributions;
3. Benefits that have been in pay status for the three-year period before plan termination or that would have been in pay status if the eligible participant had retired;
4. Benefits generally that are guaranteed by the PBGC;
5. Benefits that are vested (other than by reason of plan termination); and
6. All other benefits under the plan.
See generally B. Miller, Employee Benefits: Mergers and Acquisitions, 143-86 (1985). All benefits allocated to the first category must be met before any benefits in the second category are paid and so on until all assets are distributed. If there are insufficient assets to meet the obligations in a given category, the assets available for this priority level are allocated pro rata in proportion to the present value of the benefits at this priority level. 29 U.S.C. § 1344. The PBGC guarantees benefits up to and including those benefits placed in the fourth category.
The allocation of assets to benefits covered by category three must be made according to the plan without regard to plan amendments made within five years of termination. 29 U.S.C. § 1344(a)(3)(A) and (B). Anticipating abuse of the termination insurance, Congress included this provision to prevent plan administrators from "ballooning" benefits in anticipation of termination. Rettig v. PBGC, 744 F.2d 133, 137 (D.C.Cir.1984) citing S.Rep. No. 383, 93d Cong., 1st Sess. 82-83 (1974), U.S. Code Cong. & Admin. News 1974, p. 4639. Amendments relatively close to the time of termination could result, Congress feared, in retirees and those eligible for early retirement receiving higher benefits to the detriment of other Plan participants. The remarks of Representative Erlenborn illustrate the situation Congress intended to address:
For instance, in our hearings in Washington we were advised, of what one paper pulp mill experienced. They had a pension trust that was overfunded; it had $1 million more in assets than were needed to pay the pensions. There was a strike, and the result of that strike was to increase the pensions by about 50 to 80 percent over what they had been before. Immediately that plan became underfunded by over half a million dollars. At this point the company was forced to go out of business. Those who were already retired and those who were eligible for early retirement got much, much more than they would have before the benefits were increased. Those who were not eligible for early retirement or who were unvested were wiped out, got nothing at all.

*1492 In other words, this shows the inequity when we increase pension benefits and we allow those benefits to go into effect immediately in determining the priority in the distribution of assets to the retired and those eligible for early retirement. We can just by one simple amendment to the plan wipe out the rights of those who do not fall in the higher classification of priority. In this bill we are providing a schedule of priorities for distribution of assets on termination.
We say you must go back to the benefits in effect 5 years prior to termination to make that distribution of assets, so that a recent plan improvement will not work to the detriment of the employees.
120 Cong.Rec. H4286 (Daily Ed. February 26, 1974) (statement of Rep. Erlenborn). Section 4044 prevents abuse by relegating "ballooned" benefits from recent amendments to a lower priority category.
The PBGC has promulgated rules interpreting the allocation scheme of § 4044. Under § 4044, the plan administrator must allocate all the assets of the plan. The PBGC has interpreted § 4044 to exclude "irrevocable commitments" from plan assets. Thus, benefits payable from irrevocable commitments are not subject to the allocation process.
The issue presented here is whether plaintiffs' benefits were irrevocable commitments.[1] This Court has not found nor have the parties cited any cases interpreting the phrase "irrevocable commitment".
An irrevocable commitment is defined as an obligation by an insurer to pay benefits to a named plan participant or surviving beneficiary, if the obligation cannot be cancelled under the terms of the insurance contract (except for fraud or mistake) without the consent of the participant or beneficiary and is legally enforceable by the participant or beneficiary. An irrevocable commitment is considered to be made on its effective date.
29 C.F.R. § 2618.2 (1985). Under this definition, an annuity purchased with funds withdrawn from the pension trust would be an irrevocable commitment. Such annuities are frequently purchased at the termination of a plan. The former plan participant no longer receives benefits from the plan. Instead, the present value of the benefits is used to purchase an annuity, the payments from which replace the pension benefits. The funds used to purchase the annuity have left the fund. As the PBGC has explained, when a plan is terminated and the funds used to purchase an annuity, "the insurance company receives a single premium payment, assumes the obligation to make all benefit payments under the terminated plan, and bears all the risk and enjoys all the benefits of investment and actuarial experience under the arrangement." PBGC Opinion Letter, 12 BNA Pension Reporter 654 (May 24, 1985). Accordingly, such funds are excluded from the assets subject to allocation.[2]
The irrevocable commitment provision provides an exception to the general rule that all Plan assets must be allocated. As an exception to a remedial statute, the irrevocable commitment provision must be narrowly construed so as not to disrupt the purpose of the statute. Cf. Donovan v. Cunningham, 716 F.2d 1455, 1468 n. 27 (5th Cir.1983), cert. denied, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984); S.E.C. v. Ralston Purina, 200 F.2d 85, 89 (8th Cir.1952), rev'd on other grounds, 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953).
*1493 Whether plaintiffs' benefits were irrevocable commitments is determined by the terms of the Trust Agreement and the Group Annuity Contract (GAC) between the Plan and Lincoln National. Under the Trust Agreement, Plan participants may receive their benefits in a variety of forms. In this case, plaintiffs received their benefits from the Plan's General Investment Fund (GIF) in the form of a non-purchased annuity.[3] The GAC also provides for the payment of benefits in the form of a lump sum or, if Lincoln National terminates the contract, for payment from an annuity purchased with funds withdrawn from the GIF.
Section 6.04 of the GAC provides that the trustee and Lincoln Life may agree to change or to amend the contract without the consent of any participant or beneficiary. Specifically, in Section 6.041, Lincoln reserves the right to modify the contract to comply with local, state, or federal statutes or regulations. Section 6.042 represents an exception to the right to modify and provides that "[n]o modification will affect the amount or the terms of any annuity benefits which have been purchased prior to the effective date of the modification." This exception distinguishes between purchased annuities and non-purchased annuities, such as the certificates held by plaintiffs. In effect, § 6.042 precludes modification of annuities which have been purchased with funds withdrawn from the Plan and would apply, for example, if Lincoln National terminated the GAC.
As plaintiffs argue, their benefits are irrevocable commitments for two reasons. First, plaintiffs contend that the Plan's floor value precludes revocation of their benefits. Second, plaintiffs contend that the certificates issued to them by Lincoln National guaranteed payment of all benefits.
Regarding the floor value of the Plan, § 2.03 of the GAC sets the floor value of the plan as "the aggregate of the present values of all annuity benefits being paid or requested to be paid, as of any date, under the provisions of the [GAC]." Under § 5.022 of the GAC Lincoln National may terminate the GAC if "at any time the balance of the [GIF] becomes less than $25,000.00 plus an amount equal to the Floor." In effect, these provisions protect Lincoln National from paying benefits in excess of the GIF: if the GIF is inadequate, Lincoln National may terminate the contract and shift payment responsibilities back to the trustee. As Lincoln National correctly points out, the floor is calculated on the basis of vested benefits; the floor does not guarantee those benefits. Thus, the floor value provisions of the GAC do not convert plaintiffs' non-purchased annuities into irrevocable commitments.[4]
Similarly, the certificates issued to plaintiffs do not evidence irrevocable commitments. The certificates "guarantee that not less than 240 monthly payments (herein called guaranteed payments) shall be made." The use of the word guarantee in this context does not irrevocably commit funds to the payment of benefits. Rather, the word guarantee indicates that plaintiffs' benefits are vested or non-forfeitable. In Nachman, the employer terminated the plan with insufficient assets to pay PBGC-guaranteed benefits. As the court held, a disclaimer of liability for benefits did not shield the employer from liability up to 30% of net worth for PBGC-guaranteed benefits. In reaching this holding, the court recognized that within the pension field benefits are considered vested "even if actual realization of expected benefits might *1494 depend upon the sufficiency of plan assets." 446 U.S. at 378, 100 S.Ct. at 1734; see also Alessi v. Raybestos-Manhattan Corp., 451 U.S. 504, 512, 101 S.Ct. 1895, 1900, 68 L.Ed.2d 402 (1981) ("nonforfeitable" benefits assure the employee some benefits but do not guarantee a particular amount). Thus, the certificates indicate merely that plaintiffs' benefits have vested. Moreover, the language of the certificates does not supplement or modify the GAC:
This certificate is not a part of and does not alter or modify any of the provisions of the Group Annuity Contract. This certificate describes the annuity payments provided for under the Group Annuity Contract as of the Effective Date of Certificate. All payments and the conditions governing them are subject in every respect to the terms, conditions and limitations of the Group Annuity Contract as now in effect or as hereafter amended. All rights, privileges and benefits are governed by the provisions of said Contract and payment will be made as described in this certificate only so long as such payment continues to be provided for under the Group Annuity Contract. This certificate supersedes and replaces any and all certificates and/or certificate riders that may have been issued heretofore for the Participant under any Group Annuity Contract issued to the Contractholder by The Lincoln.
Defendants' construction of the certificates is consistent with the summary plan description booklet distributed to plaintiffs. The summary plan description booklet contains the following provision:
LOSS OF BENEFITS
CAN I LOSE, BE DENIED, OR HAVE EXPECTED BENEFITS REDUCED UNDER THE PLAN?
Yes. Loss, denial, or reduction of expected benefits can result from the following:
1. failure to qualify as a plan participant (See the Eligibility Section);
2. termination of service before becoming vested (See the Termination Section);
3. death prior to meeting the requirements for Early Survivor Annuity (See the Death Benefits Section);
4. if you are among the twenty-five highest paid employees of the employer at the time the Plan is established, there may be a restriction on your benefit;

5. your benefit may be limited by the maximum benefits allowed under ERISA;

6. if the Plan terminates, your benefit may be reduced.

(emphasis added). In addition, the summary plan description booklet provides:
PENSION BENEFIT GUARANTEE CORPORATION ARE THERE ANY GUARANTEES OF MY BENEFITS?
Yes, if the Plan terminates, benefits under this Plan are insured by the Pension Benefit Guaranty Corporation (PBGC). Generally, the PBGC guarantees most vested normal age retirement benefits, early retirement benefits, and certain disability and survivor's pensions. However, PBGC does not guarantee all types of benefits under covered plans, and the amount of benefit protection is subject to certain limitations.

The PBGC guarantees vested benefits at the level in effect on the date of plan termination. However, if a plan has been in effect less than five years before it terminates, or if benefits have been increased within the five years before plan termination, the whole amount of the plan's vested benefits or the benefit increase may not be guaranteed. In addition, there is a ceiling on the amount of monthly benefit that PBGC guarantees, which is adjusted periodically.
(emphasis added). Thus, neither the certificates issued by Lincoln National nor the floor value established by the GAC remove plaintiffs' benefits from the allocation process of § 4044. Accordingly, plaintiffs' benefits were reduced properly under the allocation process, and Home Savings did not violate its duties under ERISA during the plan termination.
*1495 Alternatively, defendants argue that if plaintiffs' benefits are not considered Plan assets, then defendants' actions were nevertheless proper because plaintiffs' benefits were subject to restriction under IRS rules.[5] 26 C.F.R. 1.401-4(c)(5) (1986) restricts those portions of benefits of the 25 highest paid employees which are payable at a termination within ten years of a plan amendment increasing benefits. Under these rules, highly compensated employees must provide collateral for any lump sum distributions they receive. By this rule, the IRS intends that plan assets "shall be allocated, to the extent possible, so that the rank and file employees receive from the Plan at least the same proportion of present value of their accured benefits (whether or not nonforfeitable) as employees who are officers, shareholders or highly compensated." Rev.Rul. 80-22, 1980-2 C.B. 133. Consistent with § 4044 of ERISA, the IRS rules are designed to prevent influential employees from "ballooning" benefits near the time of their retirement. Under IRS rules, the Plan could not distribute funds to the plaintiffs at termination unless plaintiffs provided collateral. Thus, plaintiffs' benefits were properly restricted.

B. Tortious interference counts against Home Savings and the Hamiltonian Plan
Counts III and VI of plaintiffs' complaint allege Home Savings tortiously interfered with plaintiffs' contractual rights under the GAC by decreasing their benefits. As defendants argue, a cause of action for tortious interference is inconsistent with the integrated rules of ERISA. Essentially, plaintiffs ask this Court to create a new cause of action under federal common law. In passing on the motions to dismiss, this Court reserved the issue of whether plaintiffs stated a claim under federal common law, preferring to resolve the issue in light of actual facts. The Court is now prepared to conclude that plaintiffs have stated no cause of action for tortious interference.
There is no general federal common law. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). Nevertheless, the development of federal common law is appropriate where a federal statute occupies a substantive field, displacing state law and leaving the courts only the statute and its legislative history for guidance. E.g. Textile Workers Union of America v. Lincoln Mills of Alabama, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); see also C. Wright & A. Miller 19 Federal Practice and Procedure § 4514 (1982). With the enactment of ERISA, Congress decided to occupy the pension field. Thus, in certain circumstances the development of federal common law under ERISA is appropriate. As the Eighth Circuit in Landro v. Glendenning Motor Ways, Inc., 625 F.2d 1344, 1351 (8th Cir.1980), declared,
The legislative history of the Act demonstrates that in order to fill the gaps left by ERISA's express provisions, Congress "intended that a body of Federal substantive law will be developed by the courts to deal with issues involving rights and obligations under private welfare and pension plans," 120 Cong.Rec. 29942 (1974) (remarks of Senator Javits), in much the same way as the federal courts have long fashioned federal common law under section 301 of the Labor Management Relations Act of 1974.
In fashioning rules under ERISA, the Court must be mindful of the interstitial nature of its task. Federal common law should be applied only when the statute is silent regarding the case before the Court and must never conflict directly or indirectly with the statute.
On the facts as presented on this motion, it is now clear that the creation of a new federal cause of action for tortious interference with contract would not be appropriate. If the reduction of plaintiffs' benefits was improper under ERISA, then § 1132 of ERISA provides a cause of action for recovery of these benefits. On the *1496 other hand, if the reduction was proper under the Title IV allocation scheme, then a cause of action for tortious interference would conflict with the statute. Thus, a cause of action for tortious interference with the contract, at best, would provide plaintiffs with no additional protection and, at worst, would interfere with the administration of plan terminations under Title IV of ERISA.[6]See United Electrical, Radio and Machine Workers of America v. Amcast Industrial Corp., 634 F.Supp. 1135, 1142-47 (S.D. Ohio 1986). Therefore, Counts III and VI of plaintiffs' complaint are dismissed.

C. Breach of contract by Home Savings and Hamiltonian Federal
As alleged by Count VIII of plaintiffs' complaint, Home Savings and the Plan breached their contractual obligations to fund plaintiffs' benefits fully. The parties have filed cross-motions for summary judgment on this ground. As defendants argue, the trust agreement contains no promise to pay all vested benefits. Plaintiffs respond that § 9.05 of the trust agreement and portions of the employee handbook guarantee their benefits.
Generally, ERISA does not require employers to fund all benefits but does require employers to make periodic contributions and upon termination to contribute funds up to the PBGC-guaranteed limits. Nachman, 446 U.S. at 378 n. 28, 100 S.Ct. at 1735 n. 28 (1980) (citing legislative history). Conversely, ERISA does not forbid employers from committing themselves to the full payment of vested benefits. The employer's promise to fund benefits may be contained within the pension trust agreement or in separate writings. For example, in Murphy v. Heppenstall Co., 635 F.2d 233, 235-36, (3rd Cir. 1980), cert. denied, 454 U.S. 1142, 102 S.Ct. 999, 71 L.Ed.2d 293 (1982), the Third Circuit found that the pension agreement guaranteed the vesting of benefits but not their funding. However, the court also looked to the collective bargaining agreement between the parties and there found an obligation by the employer to fund fully all vested benefits. Similarly, in In re White Motor Corp., 731 F.2d 372, 375 (6th Cir.1984), the Sixth Circuit found a guarantee to fund benefits in letter agreements between the company and the union.
Here, neither the Plan nor any separate writings guarantee benefits. In pertinent part, § 9.05 provides as follows:
Upon termination of this Plan and Trust or the complete discontinuance of contributions to this Plan and Trust, the Accrued Benefit of each Participant as of the date of termination shall become fully vested and shall not thereafter be subject to forfeiture.
Section 9.05 of the trust agreement is not a promise to fund all vested benefits. Rather, § 9.05 guarantees the vesting of benefits, which as discussed above is not equivalent to a guarantee of funding. Furthermore, several sections of the trust agreement contemplate contributions inadequate to fund all benefits. Section 9.07 sets out an asset allocation scheme similar to that of ERISA and provides for pro rata distribution of assets if funds are inadequate. In § 9.03, Hamiltonian reserved the right to discontinue contributions "at any time and in its sole discretion." Neither of these provisions is consistent with plaintiffs' interpretation of § 9.05.
Plaintiffs cite portions of the Hamiltonian Federal Employee Handbook and the summary plan description as promises to fund the Plan fully. In particular, plaintiffs cite paragraph 6 of the summary plan description: "The circumstances in the plan which may result in disqualification, ineligibility or loss of benefits are NONE." Also, plaintiffs cite page 9 of the 1980 Hamiltonian Federal Employee Handbook: "The association offers a very liberal pension plan which is completely funded by the association". *1497 As a matter of contract construction, the Court cannot find a promise to guarantee funding in these provisions. As the sections of the summary plan description cited earlier demonstrate, the description clearly explained the circumstances under which benefits could be reduced. Thus, the passages cited by plaintiffs indicate merely that plaintiffs' benefits are vested and funded solely by the Plan.[7]
Finally, plaintiffs cite Alessi and Nachman as holding that in the absence of an express disclaimer clause, an employer is obliged to fund all accrued benefits. Plaintiffs misconstrue these cases. Alessi does not treat the use of disclaimer clauses, and Nachman held merely that such clauses do not release the employer from liability for PBGC-guaranteed benefits. To the extent these cases apply to the instant facts, they support the reduction of benefits because both cases uphold the distinction between vested and guaranteed benefits. Thus, only in a case where the employer has contracted to fund vested benefits, such as Murphy or White Motor, are vested benefits guaranteed. As discussed above, the Hamiltonian Plan does not guarantee funding.

D. ERISA Count For Failure to Distribute Assets Against Home Savings and the Plan
Count XIV rests upon Home's retention of Plan assets in an escrow account. The plaintiffs allege that Home has breached its fiduciary duties by failing to distribute approximately $170,000.00 of Plan assets following termination.
Home Savings, through its actuary, has distributed benefits up to PBGC-guaranteed levels. The disbursement of the remaining funds depends upon the outcome of this litigation. Subjected to fiduciary duties to all Plan participants, Home Savings could not distribute funds without potentially breaching its duties to some Plan participants. For example, if Home Savings had paid these funds to plaintiffs and this Court decided that the funds were subject to allocation under ERISA, Home Savings would be subject to liability for payments to other participants. In addition, plaintiffs have identified no facts supporting bad faith on defendants' part. Thus, faced with conflicting duties, Home Savings acted reasonably by placing the funds in escrow. Now that the plaintiffs' claims have been dismissed, these funds will be disbursed in accordance with ERISA, the Plan, and the still pending declaratory judgment counterclaim.

E. Contract Claims Against Lincoln National
Counts II, V, and VIII allege breach of contract claims, based upon Lincoln National's failure to abide by its obligations set out in the certificates and the GAC. Each of these claims is predicated upon the alleged guarantee of benefits by the Plan. As discussed above, plaintiffs' benefits were not guaranteed and were subject to allocation under ERISA. Therefore, Lincoln National is not liable for the reduction of benefits. Furthermore, even if benefits were guaranteed by the Plan, Lincoln National would not be liable for a breach of the GAC based on the facts presented.
Section 6.07 of the GAC provides specifically that "Lincoln National assumes no liability as to the sufficiency of the general investment fund, or any other separate investment fund attributable to this Contract, to provide benefits according to the Plan." Regarding the payment of benefits, Lincoln National must act in accordance with the instructions of Home Savings. As § 4.14 of the GAC provides, "if the contract holder advised Lincoln National Life in writing that an annuity has been misstated, the amounts and date of payment of benefits with respect to such annuity will be adjusted."[8] As provided *1498 by § 6.03 of the GAC, Lincoln National may rely upon Home Savings' statements regarding the amount of benefits. Here, Home Savings notified Lincoln National that a reduction of benefits was required as a result of the Plan termination. Lincoln National reduced the payments pursuant to these instructions and in accordance with its duties under the GAC. Thus, while Home Savings could have potentially been liable for instructing Lincoln National to reduce benefits, Lincoln National did not incur liability by following these instructions.

F. ERISA Claims Against Lincoln National
Count III alleges that Lincoln National breached its fiduciary duties by reducing plaintiffs' benefits. Having concluded that plaintiffs' benefits were properly reduced under the Title IV allocation scheme, this Court grants summary judgment to defendants on this claim.

G. Bad Faith Refusal to Pay Claim Against Lincoln National
Count X alleges a tort of bad faith refusal to pay against Lincoln National. For the reasons discussed in subpart B of this opinion, defendant is granted summary judgment on Count X.

H. Counterclaims of Home Savings
Plaintiffs move for summary judgment on the counterclaims of defendants Home Savings and the Plan. Defendants present four counterclaims. Count I alleges a cause of action under 29 U.S.C. §§ 1104 and 1106 based upon plaintiffs' breaches of their fiduciary duties. In Count II, defendants seek indemnification for expenses necessitated by the fourth Plan amendment. In Counts III and IV, defendants seek a declaration of the proper allocation of the remaining fund assets.
As plaintiffs argue, Count I is barred by the statute of limitations provided by ERISA. In pertinent part, 29 U.S.C. § 1113 provides
(a) No action may be commenced under this title with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of
(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or
(2) three years after the earliest date (A) on which the plaintiff had actual knowledge of the breach or violation, or (B) on which a report from which he could reasonably be expected to have obtained knowledge of such breach or violation was filed with the Secretary under this title....
This limitation applies to actions brought under §§ 1104 and 1106. Cowden v. Montgomery County Society for Cancer Control, 591 F.Supp. 740, 754 (S.D.Ohio 1984); see also Meyer v. Phillip Morris, Inc., 569 F.Supp. 1510, 1512 (E.D.Mo.1983) (§ 1113 is expressly limited to actions brought under Subtitle B, Part 4 of Subchapter I of ERISA).
Defendants base their cause of action upon plaintiffs' adoption of amendments increasing their pension benefits and upon plaintiffs' failure at the time of their retirement to notify Lincoln National of the probable Plan termination. Thus, the cause of action is based upon events occurring as late as the time of Victor's retirement on July 31, 1981.
The complaint in this case was filed on January 29, 1985. The counterclaims relate back to the filing of the complaint. Thus, if the Court applies the three year limitations period of § 1113(a)(2), defendants' claim will be barred. The parties do not dispute Hamiltonian Federal's actual knowledge of the Plan amendments. As defendants argue, Home Savings did not *1499 acquire actual knowledge of plaintiffs' acts until April, 1983, at the earliest. The issue here is whether the knowledge of Hamiltonian Federal may be imputed to Home Savings for statute of limitations purposes.
Hamiltonian Federal merged into Southern Federal Savings and Loan, which in turn merged into Home Savings. In a merger transaction, the surviving corporation is liable for the debts and liabilities of the constituent corporation. 15 W. Fletcher, Cyclopedia of the Law of Private Corporations §§ 7086 and 7122 (Rev.Ed. 1983). This general rule applies as well to the transfer of knowledge between corporations. Cf. Forest Laboratories, Inc. v. Pillsbury Company, 452 F.2d 621, 625 (7th Cir.1971) (applying the rule that corporation purchasing assets of another corporation does not acquire knowledge of transferor in context of trade secrets). Therefore, Hamiltonian's knowledge is imputed to Home Savings, and the three year limitations period bars defendants' claim in Count I.
Counts III and IV seek declaratory judgment, concerning the undistributed Plan assets. These counts are not based upon plaintiffs' acts while employed by Hamiltonian Federal; rather, the predicate acts are the Plan termination and allocation of assets. Accordingly, plaintiffs' motion is denied as to these counts.
Finally, Count II is dismissed for failure to state a claim upon which relief may be granted. Count II is a common law cause of action for indemnification. Defendants concede that if plaintiffs fail to state a claim on plaintiffs' common law counts, then this count also fails to state a claim. Having dismissed plaintiffs' common law counts, the Court also dismisses defendants' counterclaim.
In sum, defendants are granted summary judgment as to all of plaintiffs' counts. Plaintiffs are granted summary judgment as to defendants' first and second counterclaims. The only remaining counts are defendants' counterclaims seeking a declaratory judgment. As to these remaining counts, summary judgment is inappropriate because the parties have not presented to the Court the precise figures necessary to allocate these funds. Though these counts remain unresolved, the Court anticipates that the legal principles articulated by this memorandum will obviate the necessity for trial on these counts.
NOTES
[1] Plaintiffs have not challenged the validity of these regulations.
[2] The concept of an irrevocable commitment is relevant also to overfunded plans. In the case of a "spin-off/termination", the excess assets revert to the employer. However, assets are not considered in excess unless all benefits accrued as of the date of termination "are all provided for by the purchase of annuity contracts which represent irrevocable commitments for the benefit of each individual participant." PBGC, IRS and Labor Department Guidelines On Asset Reversions, 11 BNA Pension Reporter 724 (May 28, 1984); see generally Interco Inc. v. PBGC, 620 F.Supp. 688 (E.D.Mo.1985) (discussing spin-off termination). The purchase of an annuity withdraws assets from the fund and ensures that benefits will be paid before any excess reverts to the employer.
[3] The GAC defines the GIF as "the total of all deposits credited to [the GAC] increased by any amounts added or credited to the Fund and decreased by any amounts withdrawn from or charged against the Fund."
[4] The affidavit of plaintiffs' expert states that the floor guarantees benefits to retired persons. This bald assertion neither creates a genuine issue of material fact nor renders the terms of the contract ambiguous. Furthermore, plaintiffs' expert does not base his opinion upon facts relevant to the instant case, relying instead upon statements by Lincoln National employees regarding other contracts.
[5] Both § 4044 of ERISA and the IRS rules cited below apply to the allocation of Plan assets at termination. However, where both laws apply the more specific and comprehensive provisions of ERISA govern. 49 Fed.Reg. 1182 (January 10, 1984).
[6] Assuming that a cause of action for tortious interference were appropriate, plaintiffs would nevertheless not be entitled to judgment. The plaintiffs allege that Home Savings induced Lincoln National to reduce plaintiffs' benefits. Under common law principles, the use of legal arguments to demonstrate the rational basis for a course of action is not a tort. See Prosser and Keeton on Torts § 129 (5th Ed.1984).
[7] Moreover, § 11.02 of the Plan is an integration clause providing that the Plan contains the entirety of the parties' agreement. Thus, any reliance upon separate writings is misplaced.
[8] The affidavit of plaintiffs' expert disputes the use of the misstatement clause in these circumstances. As noted above, mere assertion cannot render contract terms ambiguous, and again plaintiffs' expert does not predicate his opinion upon specific facts in this case. Moreover, plaintiffs fail to argue what result would obtain if the Court adopted their construction of the misstatement clause. Title IV of ERISA would still require reduction of plaintiffs' benefits. In other words, the misstatement clause, even under plaintiffs' construction, does not guarantee funding of plaintiffs' benefits.