Charles KINEK, Steve Konik, Ernest Moreno, and Steven Yanecko, and all persons similarly situated, Plaintiffs,

v.

GULF & WESTERN, INC., and The Pension Plan of the New Jersey Zinc Company for Bargaining Unit Employees, Defendants.

PENSION BENEFIT GUARANTY CORPORATION, Plaintiff,

v.

GULF & WESTERN, INC., and The Pension Plan of the New Jersey Zinc Company for Bargaining Unit Employees, Defendants.

Nos. 87 CIV. 6973 (LBS), 87 CIV. 7023 (LBS).

United States District Court, S.D. New York.

Aug. 14, 1989.

Bredhof & Kaiser (Elliot Bredhof, Julia Penny Clark and Cynthia L. Estlund, of counsel), Washington, D.C., and Vladeck, Waldman, Elias & Engelhard, P.C. (Seymour M. Waldman and Patricia McConnell, of counsel), New York City, for Kinek plaintiffs.

Shea & Gould (Dean G. Yuzek, Clifford James and Joan Walter, of counsel), New York City, for defendants.

Pension Benefit Guar. Corp., Office of the Gen. Counsel (Robert L. Furst, Gary M. Ford, Gen. Counsel, Carol Connor Flowe, Deputy Gen. Counsel, Jeanne K. Beck, Asst. Gen. Counsel, and David F. Power, of counsel), Washington, D.C., for plaintiff PBGC.

## OPINION

SAND, District Judge.

Defendants Gulf & Western, Inc. ("G & W") and The Pension Plan of the New Jersey Zinc Company for Bargaining Unit Employees ("G & W Plan") have moved for summary judgment, or in the alternative, to dismiss the complaint brought by Charles Kinek, Steve Konik, Ernest Moreno, Steven Yanecko and all persons similarly situated ("Kinek plaintiffs"), alleging violations of a collectively-bargained pension agreement and pension plan under § 301 of the Labor–Management Relations Act ("LMRA"), 29 U.S.C. § 185, and under § 502(a)(1)(B) and (a)(3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), (a)(3), and for violation of § 208 of ERISA, 29 U.S.C. § 1058. Plaintiffs have cross-moved for partial summary judgment as to defendants' liability, but do not seek summary judgment as to damages.

Defendants also bring their motion against Pension Benefit Guaranty Corporation ("PBGC"), a wholly-owned United States governmental corporation, whose complaint alleges violations of a collectively-bargained pension agreement and pension plan under § 301 of the LMRA, 29 U.S.C. § 185, and arising under § 502(a)(3) of ERISA, as amended by 29 U.S.C. § 1132(a)(3), § 208 of ERISA, 29 U.S.C. § 1058, and §§ 4022 and 4042(d)(1)(B)(ii), 29 U.S.C. §§ 1322, 1342(d)(1)(B)(ii). PBGC also cross-moves for partial summary judgment as to defendants' liability. Both the Kinek plaintiffs' and PBGC's cases have been consolidated for pretrial purposes.

Plaintiffs and defendants agree that there are no material facts in dispute and that the cases can be decided by summary judgment on the record now before the Court. *See* Kinek Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and, Alternatively, To Dismiss the Complaints, and in Support of Plaintiffs' Cross–Motion for Partial Summary Judgment at 2 ("Plaintiffs' Memorandum"); Defendants' Reply Memorandum of Law in Further Support of Their Motion for Summary Judgment and, Alternatively, To Dismiss the Complaints, and in Opposition to Plaintiffs' Cross–Motions for Partial Summary Judgment at 2 ("Defendants' Reply Memorandum"); Tr. at 16–17 (Mar. 16, 1989).

### Facts

Defendant G & W, through its division G & W Natural Resources Group, had operated ten facilities engaged in the mining, manufacturing, and selling of zinc oxide and other alloys. Plaintiffs in *Kinek* were employees at G & W in their facilities at Palmerton, Pennsylvania, Ogdensburg, New Jersey, and Depue, Illinois. They represent a class of persons who are similarly situated and would allegedly lose pension benefits as a result of a "spin-off" in which Horsehead Industries, Inc. ("Horsehead") purchased assets of three of G & W's ten facilities, and operated them as The New Jersey Zinc Co., Inc. ("NJ Zinc").

G & W's pension plan had included employees at all ten facilities. Certain of the employees at these ten facilities were represented by the United Steel Workers of America, AFL–CIO ("USWA"). These employees were participants in defendant Pension Plan of the New Jersey Zinc Company for Bargaining Unit Employees ("G & W Plan"). After G & W's sale of the three facilities to Horsehead, G & W transferred to Horsehead's pension plan trust assets and liabilities of the G & W Plan trust allocable to those G & W employees who would be employed by Horsehead. Horsehead, using the transferred assets, established its own pension plan known as the New Jersey Zinc Co., Inc. Pension Plan for Bargaining Unit Employees Effective As of October 1, 1981 ("NJ Zinc Plan") for the employees who were represented for purposes of collective bargaining by USWA at the three facilities involved in the asset purchase.

In the years prior to the spin-off, the G & W Plan had been the subject of collective bargaining between G & W and USWA. Prior to 1972, G & W had not been required to make regular contributions to the pension trust. In the 1972 negotiations, USWA demanded contract language that would require minimum funding. The result of these negotiations was a Pension Agreement between G & W and USWA that included, *inter alia*, a requirement that G & W provide full actuarial funding of all vested liabilities upon termination of the Plan or termination of all operations.

When ERISA became effective in 1976, G & W's employee benefits counsel rewrote the Plan and submitted it to the Internal Revenue Service for approval, without obtaining USWA's prior agreement. The document he drafted included the following provision pertaining to the transfer of assets and liabilities from the G & W Plan to another plan:

> Upon the merger or consolidation of this Plan with any other plan or the transfer of assets or liabilities from the Trust Fund to another trust, all Participants shall be entitled to a benefit at least equal to the benefit they would have been entitled to receive had the Plan been terminated in accordance with Section 10.3 immediately prior to such merger, consolidation or transfer of assets or liabilities.

Defendants' App. at Exh. C (G & W Plan § 10.2) ("transfer of assets clause").

This provision, which used the language of section 208 of ERISA, 29 U.S.C. § 1058, remained unchanged, even after USWA demanded and obtained language including G & W's earlier agreement to provide full funding upon Plan termination. The Plan signed by G & W and USWA included the following full-funding clause in section 3.1:

> Upon termination of the Plan or upon termination of all the Employer's opera-

tions, the Employer will fully fund on a sound actuarial basis all vested benefits currently payable or payable in the future under the eligibility provisions of the Plan in effect at the time of termination.

Defendants' App. at Exh. C (G & W Plan § 3.1) ("full-funding clause").

The Plan remained in effect until September 30, 1981, the date of the spin-off.

Plaintiffs claim that at the time of the spin-off no one at G & W considered "the possibility that the G & W Plan document required full funding of the vested liabilities that were to be transferred." Plaintiffs' Memorandum at 9. According to plaintiffs, the actuary simply divided up the existing assets in the G & W Plan between those employees who were remaining with G & W and those who were being transferred to NJ Zinc, and that the assets transferred to the NJ Zinc Plan "fell far short" of fully funding the vested liabilities that G & W had transferred to that plan. *Id.* at 10.

In October 1982, NJ Zinc notified USWA of its intent to terminate the new plan, and on January 1, 1983, PBGC became trustee of the plan, pursuant to ERISA § 4042(b)(1), 29 U.S.C. § 1342(b)(1). Under ERISA, PBGC was required to guarantee certain benefits, but those benefits were lower than those promised under the G & W and NJ Zinc Plans.

USWA sued NJ Zinc to require the company to provide full funding of the vested benefits. *See United Steelworkers of America, AFL–CIO v. New Jersey Zinc Co., Inc.*, No. 83–2278 (D.N.J.), *aff'd*, 828 F.2d 1001 (3d Cir.1987). USWA alleged that NJ Zinc, as successor employer, had agreed to be bound by the terms of the Pension Agreement and the G & W Pension Plan Document. However, the district court held that NJ Zinc had not agreed to be bound by these contracts, but only by the Basic Labor Agreement, which did not contain a pension funding provision, and by a pension plan document, which did not contain a promise of full funding. The Third Circuit affirmed the lower court's finding.

Plaintiffs now contend that G & W breached its contractual obligations under the G & W Plan to fund vested benefits fully in the event of a transfer, or "spin-off," of assets and liabilities to another pension plan.

### Discussion

Before we can reach the merits of these cases, we need to address two preliminary matters raised by the parties. First, we need to decide whether plaintiffs have standing to bring their claims; second, if they do have standing, we need to determine the appropriate standard of review that should be exercised by this Court.

### Standing

The Kinek plaintiffs bring this action pursuant to § 502 of ERISA and § 301 of LMRA. Defendants challenge the Kinek plaintiffs' standing under § 502 of ERISA, but not under § 301 of LMRA. *See* Defendants' Memorandum at 63–65; Defendants' Reply Memorandum at 47–49. Therefore, we address only the Kinek plaintiffs' standing under § 502 of ERISA.

The Kinek plaintiffs' standing under § 502 of ERISA derives from 29 U.S.C. § 1132(a)(1)(B), which provides:

A civil action may be brought—

(1) by a participant or beneficiary—

. . . .

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]

The Kinek plaintiffs, as participants in or beneficiaries of the G & W plan, are suing to recover past benefits that were allegedly due to them under the G & W plan, and to enforce their rights under that plan to receive future benefits. Plaintiffs' Memorandum at 45.

Defendants argue that plaintiffs are attempting to sue derivatively on behalf of the NJ Zinc Plan to recover assets allegedly due to it from G & W without having alleged or established a breach of fiduciary duty by NJ Zinc Plan's trustees, and consequently, do not have standing to bring such

a suit. Defendants' Reply Memorandum at 47. Kinek plaintiffs, however, respond that they are not seeking to bring a derivative action, but rather, they are bringing a direct action to enforce their rights under the terms of the Plan and to collect benefits owed them under the Plan. Plaintiffs' Reply Memorandum at 34. The Kinek plaintiffs' response renders moot defendants' contention.

█ Defendants also assert that if the Kinek plaintiffs are bringing a direct action, then they have failed to seek the appropriate relief, *i.e.,* benefits. However, the Kinek plaintiffs' prayer for relief includes the request that defendants G & W and the G & W Plan "make whole all members of the plaintiff class for benefits lost as a consequence of the breach of the collectively-bargained pension agreement under which they were beneficiaries and of the pension plan in which they were participants." Defendants' App. at Exh. E (First Amended Complaint). We find that that language includes a request for benefits and that the Kinek plaintiffs have pleaded a cause of action for benefits. Accordingly, we hold that the Kinek plaintiffs have standing under both ERISA and LMRA.

█ Defendants also challenge PBGC's standing to bring Counts One through Four of its complaint. Defendants assert that PBGC lacks standing under § 502 of ERISA, 29 U.S.C. § 1132, to bring Counts Two and Three because it is not a fiduciary with respect to the G & W Plan. Defendants' Memorandum at 60. Under 29 U.S.C. § 1132(a)(3), a civil action can be brought:

> by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to

redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]

Defendants argue that Count Two of PBGC's complaint, which alleges violations of 29 U.S.C. §§ 1104, 1109, and Count Three, which alleges a violation of 29 U.S.C. § 1058, can only be brought by a participant, beneficiary, or fiduciary of the plan, and defendants contend that PBGC does not fall into any of these categories. Defendants' Memorandum at 60–61.

PBGC argues with respect to Counts Two and Three that it has standing as successor trustee of the NJ Zinc Plan to bring any action that a fiduciary of the NJ Zinc Plan could have brought under section 502 to collect amounts owed to the Plan. However, PBGC is not a fiduciary of the G & W Plan, which is the plan it is attempting to sue. In *Northeast Department ILGWU Health and Welfare Fund v. Teamsters Local Union No. 229 Welfare Fund,* 764 F.2d 147, 154 (3d Cir.1985), the Third Circuit explained that § 1132(a)(3)'s reference to "fiduciaries" suing to enforce the terms of "the plan" refers to "the terms of the plan regarding which they have a fiduciary duty." In *ILGWU,* as in the case at bar, the fiduciary was a fiduciary of a benefit plan "unrelated to the one which he seeks to enforce." *Id.* In the Third Circuit's view, "Congress contemplated that there be a fiduciary relationship between the fiduciary bringing suit and the fund being sued in all cases brought under § 1132(a)(3)." *Id.* at 154 n. 5.[1]

PBGC also argues that as statutory trustee of the NJ Zinc Plan it can sue G & W for violation of G & W's contractual promise to the G & W Plan because the NJ Zinc Plan was a third-party beneficiary of that promise. However, the only case that it relies on for this proposition is *Pension Benefit Guaranty Corp. v. Beadle,* 685

---

1. In addition, the Second Circuit has taken the view that § 1132(a)(3) is to be construed narrowly. Section 1132 provides that civil actions may be brought by participants, beneficiaries, and fiduciaries of ERISA trusts, or the Secretary of Labor. The Second Circuit has declined to add new groups who can bring suit under this provision and has held that the provision is limited to only those groups explicitly named.

See *Tuvia Convalescent Center v. National Union of Hospital & Health Care Employees,* 717 F.2d 726, 730 (2d Cir.1983) (employer lacks standing to sue under 29 U.S.C. § 1132); *Pressroom Unions–Printers League Income Security Fund v. Continental Assurance Co.,* 700 F.2d 889, 893 (2d Cir.) (pension fund lacks standing to sue under § 1132), *cert. denied,* 464 U.S. 845, 104 S.Ct. 148, 78 L.Ed.2d 138 (1983).

F.Supp. 628 (E.D.Mich.1988), in which the Court held that PBGC had standing, based on 29 U.S.C. § 1342(d)(1)(B)(ii), to enforce a contract that had been made by the Plan Administrator of a subsequently terminated Plan and an actuarial firm. In Counts Two and Three of its complaint, however, PBGC has premised its standing on 29 U.S.C. § 1132, and not on 29 U.S.C. § 1342. Accordingly, we hold that PBGC lacks standing to pursue Counts Two and Three of its complaint.[2]

■ Defendants also challenge PBGC's standing to bring Count Four of its complaint, and here the reasoning of *Beadle* is relevant to PBGC's claim of standing. The Court in *Beadle* held that

> [a]bsent any guiding authority to the contrary, ... section 1342(d)(1)(B)(ii) grants the PBGC broad powers in order to enable it to collect amounts due the Plan, including the right to enforce contracts such as the one between the Plan and [the actuarial firm].

*Beadle, supra,* 685 F.Supp. at 631.

In *Beadle,* the Court construed the statute broadly and interpreted PBGC's rights to include the right to sue on a contract between the Plan of which it was trustee and an actuarial firm. Although the link that PBGC attempts to construct in the case before us is somewhat more attenuated than the link established in *Beadle* (in that PBGC is attempting to sue on a contract between the G & W Plan and its participants rather than on a contract between the NJ Zinc Plan and G & W or the G & W Plan), the statute does confer upon PBGC the right "to collect any amounts due the plan," and PBGC is attempting to collect the difference between the amount G & W transferred from the G & W Plan to the NJ Zinc Plan and the amount that it should have transferred to meet its alleged obligation to fully fund the vested benefits. Accordingly, we hold that PBGC does have standing to pursue Count Four of its complaint.

■ Although PBGC does have standing pursuant to ERISA, 29 U.S.C. § 1342(d)(1)(B)(ii), to pursue Count Four, it lacks such standing pursuant to LMRA, 29 U.S.C. § 185, to pursue Count One. PBGC alleges that it "is a third-party beneficiary of the labor agreement establishing the G & W Plan and is entitled to enforce the full funding clause against G & W." PBGC Complaint ¶ 19. PBGC, however, provides little support for its contention that it was an intended third-party beneficiary. As defendants point out, the NJ Zinc Plan was not even in existence in 1972 when the full funding clause was included. *See* Defendants' Memorandum at 58; Defendants' App. at Exh. H (Kinek's Brief in *United Steelworkers* at 4).

According to federal common law, a third party must be an intended, rather than an incidental, beneficiary in order to enforce a contract. *Reiner v. West Village Associates,* 600 F.Supp. 233, 239 (S.D.N.Y.), *aff'd,* 768 F.2d 31 (2d Cir.1985). The test, which is derived from the Restatement, is whether " '[1] recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and ... [2 whether] [sic] the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.' " *Davis v. United Air Lines, Inc.,* 575 F.Supp. 677, 680 (E.D.N.Y.1983) (quoting Restatement (Second) Section 302). Here, there is nothing in the record to indicate that the second part of the test has been met. The promisee, G & W, in agreeing to the inclusion of the full funding provision of the G & W Plan, did not manifest an intention to benefit a successor plan, which in this case is the NJ Zinc Plan. Rather, the provision was included as part of G & W's negotiations with USWA and was to the benefit of USWA's members participating in the G & W Plan. *See* Plaintiffs' Memorandum at 5. Accordingly, PBGC lacks standing under the LMRA to pursue Count Four as a third-party beneficiary.

---

**2.** We do not reach the issue of whether PBGC would have standing to bring Counts Two and Three pursuant to § 1342. *See infra* p. 284.

PBGC does have standing to pursue Count Four of its complaint for the reasons discussed above. *See supra* pp. 279–80. We need not address whether PBGC has standing to pursue Counts Five through Seven of its complaint because defendants do not challenge PBGC's standing to pursue these claims. Thus, PBGC has standing to pursue Count Four and Counts Five through Seven and the Kinek plaintiffs have standing to pursue all of their claims.

*Standard of Review*

■ After the submission of the parties' briefs and reply briefs in *Kinek,* the Supreme Court decided *Firestone Tire & Rubber Co. v. Bruch,* — U.S. —, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). After an exchange of letters between the parties, defendants found themselves "in agreement with the *Kinek* plaintiffs' counsel that that opinion supersedes much of the argument of the parties concerning the appropriate standard of review and governs correct resolution of that issue." Defendants' Letter (Mar. 10, 1989). We agree, and therefore, *Bruch,* which "is limited to the appropriate standard of review in § 1132(a)(1)(B) actions challenging denials of benefits based on plan interpretations[,]" will be our focus in determining the appropriate standard of review with respect to the Kinek plaintiffs' case.[3] *Id.* at —, 109 S.Ct. at 953–54.

In *Bruch,* the Supreme Court held that a denial of benefits challenged under § 1132(a)(1)(B) "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at —, 109 S.Ct. at 956. The Kinek plaintiffs argue that this Court should therefore engage in *de novo* review of G & W's failure to fund fully vested benefits upon transfer of Plan assets. Defendants, on the other hand, contend that G & W's interpretation of its contractual obligations should be reviewed by the more deferential "arbitrary and capricious" standard. Defendants assert that G & W falls under the exception carved out in *Bruch* (and therefore *de novo* review is inappropriate) because the G & W Plan has a Pension Committee with discretion to administer the G & W Plan. *See* Defendants' App. at Exh. C (G & W Plan § 9.3).[4]

The Kinek plaintiffs challenge defendants' contention that the Pension Committee exercises such discretion in practice. They point to deposition testimony in which the G & W Director of Retirement Plans explained that the Pension Committee's function was in "day-to-day plan administration" and it played no role in plan funding or in determining the amount of the employer annual contribution. *See* Plaintiffs' Deposition Excerpts for Summary Judgment Motions (Horstmann Depos. at 13).

Even if we assume *arguendo* that the Pension Committee has the authority that defendants now attribute to it and that section 9.3 of the G & W Plan does in fact vest the Pension Committee with such authority, there is no dispute that the Committee did not exercise its alleged authority vis-a-vis the decision to fund fully the vested benefits. As defendants acknowledged at oral argument, the "claim was not

3. Plaintiff PBGC has not addressed the issue of which standard of review should be used in its case now before us. Because PBGC's standing is based on 29 U.S.C. § 1342 rather than on 29 U.S.C. § 1132(a)(1)(B) and because it has not discussed the appropriate standard of review under this section of ERISA, we refrain from deciding the issue, and therefore, we do not reach the merits of PBGC's cross-motion at this time.

4. Section 9.3 of the G & W Plan provides in pertinent part:

The Pension Committee ... shall have full authority and responsibility for administering the Plan in accordance with its provisions and under applicable law.

The duties and responsibilities of the Pension Committee shall include, but shall not be limited to, the following:

. . . .

(b) To determine all benefits and resolution of all questions arising from the administration, interpretation and application of Plan provisions, either by general rules or by particular decisions so as not to discriminate in favor of or against any person and so as to treat all persons in similar circumstances in a uniform manner.

presented to a plan administ[rator]." Tr. at 8. Defendants could not

> point ... to the specific presentation of some sort of claim or question that benefits should have been fully funded under Section 3.1 at the time because no one who was involved in making the determination to fund pursuant to Section 10.2 had in mind the possibility of the application of 3.1.

Tr. at 9.

Accordingly, we find merit to plaintiffs' contention that the Pension Committee did not make a decision to which deference is due. Tr. at 18.

As the Supreme Court explained in *Bruch,* it is appropriate to draw from trust principles and use a deferential standard of review when "a trustee *exercises* discretionary powers." *Bruch, supra,* —— U.S. at ——, 109 S.Ct. at 954 (emphasis added). However, other principles of trust law, as well as principles of contract law, from which the courts also drew prior to ERISA, may be more appropriate when such a decision has not been made. In such contracts cases, for example, the Supreme Court found that "the court reviewed the employee's claim as it would have any other contract claim—by looking to the terms of the plan and other manifestations of the parties' intent." *Id.*

*Bruch* teaches that *de novo* review is the appropriate standard of review in § 1132(a)(1)(B) actions "challenging denials of benefits based on plan interpretations[,]" *id.* at ——, 109 S.Ct. at 953, and creates an exception into which defendants' Pension Committee does not fall. Accordingly, the Kinek plaintiffs are entitled to *de novo* review of G & W's funding level after the transfer of assets to the NJ Zinc Plan.

*The Merits*

■ The dispute now before us is a contract dispute in which plaintiffs and defendants offer alternative, and conflicting, readings of two provisions in the G & W Plan. The dispute centers on whether or not sections 3.1 (full funding clause) and 10.2 (transfer of assets clause) of the G & W Plan should be read together. Section 3.1 provides in relevant part:

> Upon termination of the Plan or upon termination of all of the Employer's operations, the Employer will fully fund on a sound actuarial basis all vested benefits currently payable or payable in the future under the eligibility provisions of the Plan in effect at the time of termination.

Defendants' App. at Exh. C (G & W Plan § 3.1).

Section 10.2 provides as follows:

> Upon the merger or consolidation of this Plan with any other plan or the transfer of assets or liabilities from the Trust Fund to another trust, all Participants shall be entitled to a benefit at least equal to the benefit they would have been entitled to receive had the Plan been terminated in accordance with Section 10.3 immediately prior to such merger, consolidation or transfer of assets or liabilities.

Defendants' App. at Exh. C (G & W Plan § 10.2).

According to the Kinek plaintiffs' interpretation, § 3.1 and § 10.2, when read together, require G & W to provide full funding of plaintiffs' vested benefits when it transferred those employees to another company. Section 3.1 provides that participants are entitled to full funding in the event of a termination or cessation of operations. Section 10.2 provides that in cases of a transfer of assets, such as we have here, participants are entitled to the full funding of their benefits just as they would have received in the event of a termination. If participants would have been entitled to full funding in the event of a termination, then they are entitled to at least the same in the event of a transfer of assets. The language of § 10.2 requires that in the event of a transfer of assets the participants should not be placed in any less advantageous position than they would have been placed in the event of a termination. Plaintiffs' claim of full funding upon a transfer of assets is premised on their reading of these two provisions in the G & W Plan; they are not arguing that ERISA requires full funding in the event of a transfer.

Defendants contest this interpretation of the contract and counter with an interpretation in which sections 3.1 and 10.2 are read separately. According to defendants' reading, § 3.1 requires full funding *only* in the event of a termination or cessation of operations. Because neither of these events occurred here, G & W argues that it is under no obligation to fully fund the accrued benefits of those employees who went to work for Horsehead. Defendants urge that the two provisions should be read separately and make several arguments to buttress their position, including the following: that ERISA does not require full funding in the event of a transfer of assets; that each provision is found in a separate section of the Plan; that § 10.2 explicitly referred to § 10.3, but did not contain any reference to § 3.1; and that § 3.1 was negotiated by G & W and USWA, whereas § 10.2 was inserted merely to conform the Plan with the requirements of ERISA.

■ We find the Kinek plaintiffs' interpretation of the contract to be the more persuasive of the two and hold that §§ 3.1 and 10.2 need to be read together. Many of the arguments that defendants offer in opposition to plaintiffs' approach can be disposed of fairly quickly. For example, defendants are correct in their assertion that ERISA does not require full funding in the event of a transfer of assets; however, plaintiffs' claim is that the contract, and *not* the statute, requires full funding upon a transfer of assets. Although ERISA provides a minimum level of funding[5] that the employer must maintain in the event of a termination or spin-off, ERISA does not prevent an employer from promising more extensive funding, as was the case here.

Defendants cite to *Victor v. Home Savings of America*, 645 F.Supp. 1486, 1496 (E.D.Mo.1986), for the proposition that an employer does not have an obligation to fund fully a plan, *see* Defendants' Memorandum at 44, but *Victor* held that the employer does not have an obligation to fund fully when such a promise is not contained in the plan: "As a matter of contract construction, the Court cannot find a promise to guarantee funding in these provisions." *Id.* at 1497. However, *Victor* does not speak to the case in which "the employer has contracted to fund vested benefits." *Id.* The case at bar is such a case. *See, e.g., Murphy, supra,* 635 F.2d at 239 ("It is not inconsistent with the statutory scheme to permit employees to recover directly from the employer any additional benefits to which the employer has contractually obligated itself.").

Defendants' contention that § 3.1 and § 10.2 are found in different sections of the contract, and therefore, cannot be read together is undercut by § 12.6 of the contract. Section 12.6 provides:

> The titles and headings of the sections in this instrument are for convenience of reference only. In the event of any conflict between the text of this instrument and the titles or headings, the text rather than such titles or headings shall control.

Defendants' App. at Exh. C (G & W Plan § 12.6).

By the contract's own terms, then, § 3.1 and § 10.2 can be read together even though the former is under a section called "Contributions" and the latter is under a section entitled "Amendment, Merger and Termination of the Plan."

Defendants' argument that § 10.2 refers explicitly to § 10.3, and not to § 3.1, and therefore, § 10.2 and § 3.1 should not be read together, is also unpersuasive. Section 3.1 explains to what extent benefits must be funded at termination, whereas § 10.3 contains the procedures for termination of the Plan. The two sections serve different functions, and § 10.2's explicit reference to § 10.3 does not preclude § 3.1 from being read together with § 10.2.

---

5. H.R.Rep. No. 533, 93d Cong., 2d Sess. (reprinted in 1974 U.S.Code Cong. & Admin. News 4639, 4640) emphasizes that ERISA was intended to provide only minimum standards for pension plans. *See Murphy v. Heppenstall Co.*, 635 F.2d 233, 239 (3d Cir.1980) ("ERISA established 'minimum standards' for pension payments due retired employees."), *cert. denied,* 454 U.S. 1142, 102 S.Ct. 999, 71 L.Ed.2d 293 (1982).

Defendants' argument that §§ 3.1 and 10.2 were included in the contract at different times and for different purposes is also to no avail. In 1981, at the time of the spin-off, both provisions were part of the contract and the contract is to be read as a whole.

Defendants also argue that § 3.1 was included after much negotiation between G & W and USWA, whereas § 10.2 was added only to conform the plan to the requirements of ERISA. However, even if § 10.2 were included only to conform to ERISA that does not mean that the provision is without substance. Certainly, Congress could not have intended employers to add language to their pension plans that was intended to be without effect. Moreover, § 10.2, which mirrors the language of § 208 of ERISA, provides an important right for employees. It guarantees that in case of a transfer of assets, employees who are transferred will have their benefits funded to the same extent as they would have been entitled had there been a termination. Defendants' argument that § 10.2 was added "solely" to conform to ERISA would reduce the provision to surplusage and undercut the policy behind the statute.

### Conclusion

For the reasons stated above, we reject defendants' interpretation of the G & W Plan, and accordingly, deny their motion for summary judgment. Kinek plaintiffs have cross-moved for partial summary judgment on the basis of their interpretation of the G & W Plan. We grant their cross-motion for partial summary judgment and hold that defendants are liable for full funding in the event of a transfer, as provided in the G & W Plan.[6] We have not been asked to determine the extent of defendants' liability at this time.

Although PBGC has standing to bring its claim under 29 U.S.C. § 1342, it has not addressed the issue of the appropriate standard of review by this Court. Accordingly,

we refrain from reaching the merits of PBGC's cross-motion for partial summary judgment at this time.

The parties are to advise the Court in writing by September 14, 1989 what further proceedings, if any, are desired in this matter.

SO ORDERED.

---

**6.** Having found merit in plaintiffs' interpretation of the contract and having found in favor of plaintiffs on their claim pursuant to 29 U.S.C. § 1132(a)(1)(B), we need not reach the merits of the other claims they raise, under 29 U.S.C. § 185 and 29 U.S.C. § 1058, in support of their interpretation of the contract.