**Peter J. VICINANZO, as Conservator of the property of Joan Short Vicinanzo, and Peter J. Vicinanzo, individually, Plaintiffs,**

v.

**BRUNSCHWIG & FILS, INC., and New England Mutual Life Insurance Company, Defendants.**

**No. 88 Civ. 7975 (CLB).**

United States District Court,
S.D. New York.

June 14, 1990.

See also 739 F.Supp. 891.

Susan Corcoran, Birbower, Montalbano, Condon & Frank, P.C., New City, N.Y., for plaintiffs.

Stephen Ruffino, Gibney, Anthony & Flaherty, New York City, for Brunschwig & Fils.

Kenneth Klein, Smith & Laquercia, P.C., New York City, for New England.

## MEMORANDUM AND ORDER

BRIEANT, Chief Judge.

On October 30, 1983, Joan Short Vicinanzo, an employee of defendant Brunschwig & Fils, Inc. (B & F), was seriously injured in an off-duty automobile accident. For more than seven years, she was a valued employee and wallpaper designer. Now, nearly seven years later, she is completely, but perhaps not permanently disabled, and requires round-the-clock medical care at a cost of approximately $300,000 per year.

This lawsuit involves her continuing rights, if any, under an employee benefit plan sponsored by B & F and issued by New England Mutual Life Insurance Company ("New England"). The Court has jurisdiction under 29 U.S.C. § 1132(e) (1987) ("ERISA") and 28 U.S.C. § 1331.

By motions heard and fully submitted on November 6, 1989 defendants moved to strike plaintiffs' jury demand on the ground that Section 510 of ERISA, 29 U.S.C. § 1140 (1974), which prohibits dis-

criminatory interference with the rights of plan beneficiaries, creates no statutory right to a jury trial and, as an equitable provision, lies beyond the sweep of the Seventh Amendment to the Constitution. For their part, plaintiffs contend that Section 510 is enforceable through the private right of action provided under Section 502, 29 U.S.C. § 1132 (1987), and that actions brought under Section 502 often present legal, as opposed to equitable, claims. The motions are denied for the reasons set forth below. Plaintiffs are entitled to try their claims before a jury, both by statutory implication and under the Seventh Amendment.

## DISCUSSION

At the time of Mrs. Vicinanzo's accident, she was insured under a group medical, dental and life insurance policy and group long-term disability policy (collectively, "the Policy"). Issued by New England Mutual Life Insurance Company ("New England") and governed by ERISA, the Policy provides that Major Medical Benefits are payable for expenses incurred while the employee is "covered" and sets no lifetime limit. Should "employment" terminate as a result of sickness or injury, coverage "shall" (according to the Policy) or "may" (according to the Certificate of Insurance) continue until the employer

(a) acting in a uniform and non-discriminatory manner which precludes individual selection, notifies New England in writing, to cancel; or

(b) the applicable date specified below.

Sickness or injury—continuance is indefinite.

Pursuant to the Policy, New England paid Mrs. Vicinanzo's medical expenses for more than three and half years following the accident. Then, by a letter dated July 2, 1987, B & F notified plaintiffs that because New England no longer viewed Mrs. Vicinanzo's claims as a pooled risk and had announced its intention to charge back $300,000 per year to her employer, Mrs. Vicinanzo's employment would terminate as of July 23, 1987.[1] After advising plaintiffs of their rights under New York law to obtain a statutory continuation of benefits and a conversion policy at their own expense, B & F instructed New England to terminate Mrs. Vicinanzo's insurance coverage. It is at least implicit that B & F acted at the suggestion of New England and solely to avoid the threatened annual premium surcharge resulting from New England's refusal to treat the claims as a pooled risk. Thereafter, plaintiffs received Extended Major Medical Benefits for twelve more months before going onto the conversion policy.

In the absence of a stipulation of counsel, plaintiffs could have sued in this Court for a sum certain.[2] Had they prevailed, they then could have recovered, under ordinary principles of issue preclusion, an indefinite number of subsequent judgments for future medical care, provided only that Mrs. Vicinanzo remains in need of medical care.

In two previous opinions, we granted defendants' motions for summary judgment on several of plaintiffs' ERISA claims. *See* Memorandum and Order of April 15, 1989 (treating defendants' Rule 12 motions as Rule 56 motions); Memorandum and

---

1. In an earlier opinion, we noted that " 'New England's decision to alter its pooled risk rating plan is currently being investigated by the New York Department of Insurance[,]' " and " '[t]he *Department has indicated that its present intent is to issue a cease and desist order enjoining New England from making the planned changes.*' " Memorandum and Order of August 30, 1989 at 2–3 (quoting B & F's Memorandum in Support of Summary Judgment. No such order has yet been issued, and the investigation remains unresolved.

2. In companion New York State litigation between these parties, since abandoned (*Vicinan-*

*zo, et al. v. New England Life Insurance Company, et al.*, Sup.N.Y., County of Rockland, Index # 1032/88), Justice Meehan on February 8, 1989 continued in effect a Preliminary Injunction against the cessation of payments "for sixty (60) days to permit the plaintiff to seek an injunction in Federal Court". See Decision and Order dated February 8, 1989 attached as Exhibit C to Doc. 23 in this action. On April 11, 1989 counsel appeared before this court and agreed, on the record, to "extend the State Court Injunction" pending disposition of this action or further order of this Court.

Order of August 30, 1989 (discussing defendants' subsequent Rule 56 motions). At least three contested issues, however, have precluded summary adjudication of plaintiffs' Section 510 claims. These include:

(i) Whether, under the Policy, coverage of medical expenses extends for the indefinite period of disability (as it reads literally) or only while an employee is "covered" —a central question since Mrs. Vicinanzo's disability and expenses might persist for the rest of her life;

(ii) Whether, under the Policy, B & F has an option to terminate coverage for sickness or injury so long as such termination is performed in a uniform and non-discriminatory manner that precludes individual selection—a mixed question of contractual and statutory interpretation since plaintiffs claim not only that the Policy is ambiguous on this point but also that any such provision is unenforceable as violative of ERISA; and

(iii) Whether B & F, which had no preexisting policy as to the termination of disabled employees, may be regarded as having terminated Mrs. Vicinanzo's coverage in a uniform and non-discriminatory manner. B & F's board of directors purported to terminate coverage in accordance with a newly adopted official corporate policy. Apparently, however, this policy was adopted sometime after Mrs. Vicinanzo's accident, either in response to that event or at the suggestion of New England. B & F's Board resolution states:

> [I]n the event of the continuous, long-term illness or injury of the Corporations' employees, the Corporation shall terminate the coverage of the employees in question under the Corporation's health insurance plan at the end of the period beginning on the first date of said injury or illness and ending one year thereafter, plus one additional month per year of service of said employees.

Relying on this resolution, B & F claims that Mrs. Vicinanzo, who had approximately seven years' tenure with the company prior to her accident, received substantially more insurance coverage than she was owed. But it remains an open issue wheth-er this resolution establishing a corporate policy—enacted after Mrs. Vicinanzo's accident, with full knowledge of her continuing disability, and quite probably as an alternative to paying $300,000 per year in annual premiums—may be regarded as "uniform and non-discriminatory." Surely it does not qualify as such merely by reciting words of general application; the events surrounding its enactment and application are apt to suggest far more to the trier of the facts than are superficially neutral phrases. For this reason alone, plaintiffs' Section 510 claims may be assessed only after a full trial on the merits. The trial will reach issues such as motivation and intent, matters peculiarly suitable for resolution by a trial jury.

In keeping with " 'the cardinal principle that [the courts] will first ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided[,]' " *Curtis v. Loether,* 415 U.S. 189, 192 n. 6, 94 S.Ct. 1005, 1007 n. 6, 39 L.Ed.2d 260 (1974) (quoting *United States v. Thirty–Seven Photographs,* 402 U.S. 363, 369, 91 S.Ct. 1400, 1404, 28 L.Ed.2d 822 (1971)), we begin by examining the language of ERISA itself. Section 510, the provision under which plaintiffs sue, provides:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which his entitled under the provisions of an employee benefit plan, this subchapter, ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter ... The provisions of [Section 502] of this title shall be applicable in the enforcement of this action.

29 U.S.C. § 1140 (1974). Section 502, in turn, states:

> (a) Persons empowered to bring a civil action
>
> A civil action may be brought—
>
> (1) by a participant or beneficiary—
>
> (A) for the relief provided for in subsection (c) of this section, or

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

29 U.S.C. § 1132(a)(1) (1987). Under these provisions, private causes of action may be founded not only on statutory rights but also on rights peculiar to individual ERISA plans; employee benefit rights created by private agreement are no less worthy of protection than rights defined by the ERISA statute itself. Similarly, interference with rights arising in the future is no less actionable than interference with present rights. Section 510 makes it quite clear that plaintiffs need not wait for benefits to become due before suing to enforce their rights. They have the option of doing so—in which event their claim would be for recovery of a sum of money in excess of twenty dollars and within the traditional reach of the Seventh Amendment—but the statute does not require it.

█ Perhaps because the right to a jury trial on claims of legal entitlement is so obvious, ERISA makes no *express* provision for jury trials even on fact-oriented issues arising in purely contractual cases. In *Paladino v. Taxicab Industry Pension Fund*, 588 F.Supp. 37 (S.D.N.Y.1984), however, this Court found an *implied* statutory right to a trial by jury in such cases. *Paladino*, decided before *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), discussed below, assumed that there was no constitutional right to a jury trial in ERISA actions because they are "essentially equitable in nature." In *Paladino*, plaintiff sought a declaratory judgment with respect to his rights to receive pension benefits due at the time and to become due in the future, and defendant trustee of the pension fund defended by arguing that plaintiff had not accumulated enough continuous service credits in the industry to enjoy a vested pension. Upholding plaintiff's jury demand, we wrote:

Plaintiff seeks to have the Court review the exercise of fiduciary powers by trustees within the rubric of "arbitrary and capricious," or according to the standard of whether the decision [that in fact he had interrupted his industry service] is supported by substantial evidence. The trier of fact in an ERISA enforcement action is not authorized to substitute his, her or its judgment and discretion for that of the trustees. However, beneath this seemingly "equitable" issue, there lurks a simple question: whether plaintiff had a break in his service in the taxicab industry which forfeited his prior service credit. This represents a pure issue of fact and is the sort of question which is particularly appropriate for resolution by a trial jury.

To find that there is no Seventh Amendment right to a jury trial does not answer the entire question. Even where there is no constitutional right to a jury trial, a court must examine the statute which created the new right of action, in this case ERISA, to ascertain whether Congress impliedly provided a right to a jury trial. The Seventh Amendment does not prevent Congress from providing a right to a jury trial where a newly contrived statutory remedy is made available to litigants. See *The Propeller Genesee Chief v. Fitzhugh*, 53 U.S. (12 How.) 443 [13 L.Ed. 1058] (1851).

This Court believes that on balance it was the intent of Congress that ERISA plan enforcement actions be regarded as legal in nature, and that litigants be entitled to a jury trial. Essentially, the right to a pension may be regarded as arising out of contract. The would be pensioner is a third-party beneficiary of the agreement between his labor union, the employers and the trustees.

Nor is it rational to assume that Congress intended that the right to a jury trial *vel non* should depend on whether immediate benefits are available, as they apparently are in this case, in which event, the action is an action for a money judgment, or whether a declaratory judgment is sought that benefits will be available at a future time. In the latter action, the would be pensioner wants to adjudicate his rights in advance of entitlement, while the witnesses are avail-

able and in order that he may make plans for the future. There is no logical reason to require plaintiff in the latter case to give up his right to a jury simply because no payment is currently due. 588 F.Supp. at 39.

This reasoning has not been addressed directly by our Court of Appeals. In *Haeberle v. Board of Trustees of Buffalo Carpenters*, 624 F.2d 1132, 1136 (2d Cir.1980), the Court of Appeals expressed "reservation about the practice of taking [an ERISA action] away from a jury, rather than setting aside an incorrect verdict[.]" In similarly oblique fashion, *Pollock v. Castrovinci*, 476 F.Supp. 606 (S.D.N.Y.), *aff'd without opinion*, 622 F.2d 575 (2d Cir.1980), upheld a district court ruling to the effect that the legal issue of what benefits were due under an ERISA plan should be tried to a jury even though the equitable claim for reformation of the plan was triable to the court. Thereafter, in *Katsaros v. Cody*, 744 F.2d 270, 278 (2d Cir.1984), the Court of Appeals concluded that plaintiffs in an ERISA action were not entitled to a jury trial on claims for "equitable relief in the form of removal and restitution as distinguished from damages for wrongdoing or nonpayment of benefits[.]"

These rather cryptic appellate decisions have created considerable confusion in the district courts. In *Abbarno v. Carborundum Co.*, 682 F.Supp. 179 (W.D.N.Y.1988) (Elfvin, J.), the court interpreted *Katsaros* as holding, by negative implication, that ERISA plaintiffs whose claims are essentially legal in nature have a Seventh Amendment right to a jury trial. This Court agrees with that analysis. By contrast, in *Nobile v. Pension Commission*, 611 F.Supp. 725 (S.D.N.Y.1985) (Knapp, J.), the court, reading *Katsaros* as a retreat from *Pollock*, perceived a bright-line rule denying altogether the right to a jury trial in ERISA actions. And in *Brock v. Group Legal Administrators, Inc.*, 702 F.Supp. 475 (S.D.N.Y.1989), Judge Edelstein cited *Paladino* but "question[ed], particularly in light of *Katsaros*, whether a case turning on a factual issue or a legal issue is dispositive of the right to a jury trial." He con-

cluded that "[t]he focus of the inquiry must be on the nature of the claims and whether the relief sought is equitable or legal." *Id.* at 476.

The *Brock* opinion misapprehends our holding in *Paladino*. We agree that insofar as concerns the constitutional right to a jury trial, "the focus of the inquiry must be on the nature of the claims and whether the relief sought is equitable or legal." *Brock, supra,* at 476. But in determining the scope of an implied statutory right to a jury trial, it is essential to consider interests broader than those protected by the Constitution—including whether "the crux of the case [is] a factual determination" of the sort traditionally made by common law juries. *Id.* In *Paladino*, we avoided the constitutional issue in favor of a statutory solution; in the face of legislative silence, we held that ERISA impliedly conferred a jury trial right with respect to factual disputes arising in connection with contracts or trust instruments. We reasoned that since ERISA augmented, as opposed to displaced, earlier common law rights, various rights above and beyond those preserved by the Seventh Amendment are implicit in the statute itself.

Our analysis in *Paladino* applies with equal force to the present case. As in *Paladino*, factual questions arising in connection with contractually defined rights lie at the heart of this action, and these matters are "particularly appropriate for resolution by a trial jury." *Paladino*, 588 F.Supp. at 39. We therefore hold that plaintiffs are entitled to a jury trial on the ground that Congress impliedly preserved their right to such a trial.

■ We now consider the constitutional issue as an alternative ground to support our present decision. The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." This right "includes more than the common-law forms of action recognized in 1791; the phrase 'Suits at common law' refers to 'suits in which *legal* rights [are] to be ascertained and

determined, in contradistinction to those where equitable rights alone [are] recognized, and equitable remedies alone [are] administered.'" *Teamsters Local 391 v. Terry*, 493 U.S. ——, ——, 110 S.Ct. 1339, 1344, 108 L.Ed.2d 519 (1990) (quoting *Parsons v. Bedford*, 3 Pet. 433, 447, 7 L.Ed. 732 (1830)). The right to a jury trial is not lost where legal and equitable issues are presented in a single case or where legal issues are only "incidental" to equitable issues. *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962).

Congress may create non-jury causes of action based on "public rights," *e.g. Atlas Roofing Co. v. Occupational Safety and Health Review Commission*, 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977) (the Seventh Amendment does not apply when the government brings a claim for civil penalties before an administrative agency), or displace common law causes of action in favor of newly created substantive rights, *e.g. Mountain Timber Co. v. Washington*, 243 U.S. 219, 37 S.Ct. 260, 61 L.Ed. 685 (1917) (the no-fault workman's compensation system does not infringe on the Seventh Amendment by providing for an administrative adjudication of factual disputes). But the Seventh Amendment "embrace[s] all suits which are not of equity and admiralty jurisdiction, whatever may be the peculiar form which they may assume to settle legal rights." *Parsons v. Bedford*, 3 Pet. 433, 447, 7 L.Ed. 732 (1830). "Legal claims are not magically converted into equitable issues by their presentation to a court of equity." *Ross v. Bernhard*, 396 U.S. 531, 538, 90 S.Ct. 733, 738, 24 L.Ed.2d 729 (1970). The Supreme Court has long recognized that "[t]he Seventh Amendment does apply to actions enforcing statutory rights, and requires a jury trial upon demand, if the statute creates legal rights and remedies, enforceable in an action for damages in the ordinary courts of law." *Curtis v. Loether, supra*, 415 U.S. at 194, 94 S.Ct. at 1008. In determining the right to a jury trial, the relevant inquiry is whether a claim involves "rights and remedies of the sort traditionally enforced in an action at law[,]" *Pernell v. Southall Realty*, 416 U.S. 363, 94 S.Ct.

1723, 40 L.Ed.2d 198 (1974), and not whether those rights have been recast in statutory garb.

Only last term the Supreme Court revisited its earlier Seventh Amendment teaching in *Teamsters Local 391 v. Terry, supra*. As the Court explained,

[t]o determine whether a particular action will resolve legal rights, we examine both the nature of the issues involved and the remedy sought. "First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature." *Tull [v. U.S.] supra*, [481 U.S. 412] at 417–418 [107 S.Ct. 1831, 1835–1836, 95 L.Ed.2d 365 (1987)] (citations omitted). The second inquiry is the more important in our analysis. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. ——, —— [109 S.Ct. 2782, ——, 106 L.Ed.2d 26] (1989) (footnote omitted).

*Id.* 493 U.S. at ——, 110 S.Ct. at 1345. The Court emphasized that the right to a jury trial does not depend on whether "'the issues are typical grist for the jury's judgment.'" *Id.* at ——, 110 S.Ct. at 1346 (quoting Stevens, J., at ——, 110 S.Ct. at 1353, concurring in part and in the judgment). While relevant to determining "'whether Congress has permissibly entrusted the resolution of certain disputes to an administrative agency or specialized court of equity, and whether jury trials would impair the functioning of the legislative scheme,'" *id.* at ——, 110 S.Ct. at 1347 (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. ——, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989)), such practical considerations "ha[ve] never been relied on ... 'as an independent basis for extending the right to a jury trial under the Seventh Amendment.'" *Id.* (quoting *Tull, supra*, 481 U.S. at 418 n. 4, 107 S.Ct. at 1836 n. 4). Indeed, with the exception of "public rights" cases before specialized tribunals, broad statutory interests and objectives should play no role in delineating the constitutional right to a jury trial. As Justice

Scalia has explained in another context, "central feature[s] of the Constitution must be anchored in rules, not set adrift in some multi-factored 'balancing test'[.]" *Granfinanciera*, 492 U.S. at ——, 109 S.Ct. at 2805 (1989) (Scalia, J., concurring in part and concurring in the judgment).

The Supreme Court's most recent Seventh Amendment cases appear to reflect precisely such a rule-oriented approach. In *Local 391*, for example, respondents alleged that their employer had breached a collective bargaining agreement in violation of Section 301 of the Labor Management Relations Act of 1947 and that their Union had violated its duty of fair representation by declining to refer respondents' charges to the appropriate grievance committee. Respondents sought compensatory damages for lost wages and health benefits as well as injunctive relief, demanding a jury trial on all issues triable before a jury. After the employer filed for bankruptcy and obtained a dismissal of all claims against it (including those for injunctive relief), the Union moved to strike respondents' jury demand on the ground that no right to a jury trial exists on a claim for breach of the duty of fair representation. The District Court denied the Union's motion, and the Court of Appeals affirmed.

In affirming the Fourth Circuit's decision, the Supreme Court placed great analytical weight on the individual issues to be proved at trial. The Court noted that "to recover from the Union here, respondents must prove both that [the employer] violated § 301 by breaching the collective-bargaining agreement and that the Union breached its duty of fair representation." *Local 391*, 493 U.S. at ——, 110 S.Ct. at 1347. The Court conceded that "[w]hen viewed in isolation, the duty of fair representation issue is analogous to a claim against a trustee for breach of fiduciary duty[,]" but it found that the antecedent question—whether respondents had a meritorious claim under § 301 for breach of the collective bargaining agreement—was "comparable to a breach of contract claim—a legal issue." *Id.* Previously, in *United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 101 S.Ct. 1559, 67 L.Ed.2d 732

(1981), the Court had declared a § 301 action against an employer more similar to an action to set aside an arbitration award than to a breach of contract action. But the Court distinguished *Mitchell* on the ground that it had analyzed the action "as a whole" whereas "the Seventh Amendment requires that we treat each issue [in *Local 391*] separately." 493 U.S. at ——, 110 S.Ct. at 1348. This approach, unflatteringly described in the dissent as "pars[ing] legal elements out of equitable claims[,]" freed the Court to conclude that "[w]hen considered by itself, the § 301 issue is closely analogous to a breach of contract claim." *Local 391*, 493 U.S. at —— n. 7, 110 S.Ct. at 1347 n. 7.

This analogy to contract law, however, did not complete the Court's analysis in *Local 391*. The Court also held that the respondents' claim for backpay was not one for restitution or disgorgement but rather for "wages and benefits [respondents] would have received from [the employer] had the Union processed the employees' grievance properly." 493 U.S. at ——, 110 S.Ct. at 1348. The Court acknowledged that in some statutory settings backpay remedies had been regarded as incidental to injunctive powers, *see e.g. Mitchell v. DeMario Jewelry, Inc.*, 361 U.S. 288, 291–92, 80 S.Ct. 332, 334–36, 4 L.Ed.2d 323 (1960), or as primarily concerned with vindicating federal policy interests. *See e.g. Albemarle Paper Co. v. Moody*, 422 U.S. 405, 415–18, 95 S.Ct. 2362, 2370–72, 45 L.Ed.2d 280 (1960). But in *Local 391* the Court concluded that actions for breach of the duty of fair representation target " 'the wrong done the individual employee[,]' " *Electrical Workers v. Foust*, 442 U.S. 42, 49 n. 12, 99 S.Ct. 2121, 2126 n. 12, 60 L.Ed.2d 698 (1979) (quoting *Vaca v. Sipes*, 386 U.S. 171, 182 n. 8, 87 S.Ct. 903, 912 n. 8, 17 L.Ed.2d 842 (1967)), and, as such, give rise to claims for compensatory backpay.

Similarly, in *Granfinanciera, S.A. v. Nordberg, supra*, the Court upheld a bankruptcy trustee's right to a jury trial on the ground that actions to recover fraudulent conveyances more nearly resemble state common law claims by the bankrupt than

they do creditors' disputes over relative shares of the bankrupt's estate. As the Court wrote:

Congress may devise novel causes of action involving public rights free from the strictures of the Seventh Amendment if it assigns their adjudication to tribunals without statutory authority to employ juries as factfinders. But it lacks the power to strip parties contesting matters of private right of their constitutional right to a trial by jury ...

In certain situations, of course, Congress may fashion causes of action that are closely *analogous* to common-law claims and place them beyond the ambit of the Seventh Amendment by assigning their resolution to a forum in which jury trials are unavailable. See, *e.g., Atlas Roofing,* 430 U.S., at 450–461 [97 S.Ct. at 1266–1272] (workplace safety regulations); *Block v. Hirsch,* 256 U.S. 135, 158 [41 S.Ct. 458, 460, 65 L.Ed. 865] (1921) (temporary emergency regulation of rental real estate). See also *Pernell v. Southall Realty,* 416 U.S., at 382–383 [94 S.Ct. at 1733–1734] (discussing cases); *Murray's Lessee v. Hoboken Land and Improvement Co.,* 18 How. 272, 284 [15 L.Ed. 372] (1856) (noting that Congress "may or may not bring within the cognizance of the courts of the United States, as it may deem proper," matters involving public rights). Congress' power to do so is limited, however, just as its power to place adjudicative authority in non-Article III tribunals is circumscribed. See *Thomas v. Union Carbide Agricultural Products Co.,* 473 U.S. 568, 589, 593–594 [105 S.Ct. 3325, 3337, 3339–3340, 87 L.Ed.2d 409] (1985); *id.,* at 598–600 [105 S.Ct. at 3342–3343] (Brennan, J., concurring in judgment); *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 73–76 [102 S.Ct. 2858, 2872–2874, 73 L.Ed.2d 598] (1982) (opinion of Brennan, J.); *id.,* at 91 [102 S.Ct. at 2881] (Rehnquist, J., concurring in judgment). Unless a legal cause of action involves "public rights," Congress may not deprive parties litigating over that right of the Seventh Amendment's guaranty to a jury trial.

*Id.* 492 U.S. at ——, 109 S.Ct. at 2795. The Court admitted that accommodating the trustee's jury demand might undercut the statutory distinction between "core" and "noncore" bankruptcy proceedings, but concluded that Congress, in denominating fraudulent conveyance actions "core" proceedings, had not created a "public right" but had "simply reclassified a pre-existing common-law cause of action that was not integrally related to the reformation of debtor-creditor relations and apparently did not suffer from any grave deficiencies." *Id.* at ——, 109 S.Ct. at 2800. In the same vein, the Court conceded that jury trials might impede the swift and inexpensive resolution of bankruptcy proceedings, but swept aside such practical concerns as " 'insufficient to overcome the clear command of the Seventh Amendment.' " *Id.* at ——, 109 S.Ct. at 2801, quoting *Curtis v. Loether,* 415 U.S. 189, 198, 94 S.Ct. 1005, 1010, 39 L.Ed.2d 260 (1974).

This recognition of the true force of the Seventh Amendment suggests doctrinal change affecting a host of federal statutes that do not involve the adjudication of "public rights" by non-Article III tribunals. In *Lytle v. Household Manufacturing Inc.,* 493 U.S. ——, 110 S.Ct. 1331, 108 L.Ed.2d 504 (1990), decided on the same day as *Local 391, supra,* the Court hinted at such implications when it observed in a footnote that it "has not ruled on the question whether a plaintiff seeking relief under Title VII has a right to a jury trial[.]" This gratuitous remark is astonishing, if only because Title VII, 42 U.S.C. § 2000e–2 (1964)—part of a statute born of elitist mistrust of juries, and therefore bristling with equitable remedies—has long been regarded as a non-jury statute. For many years, some federal district courts have taken the view that juries are infected by the same prejudice that Title VII seeks to abolish, and have concluded that only judges can be trusted to apply such a statute. If this analysis is wrong—and the Supreme Court now has intimated as much—the error must lie in the practice of denying jury trials on the basis of supposed functional or practical considerations. *Ly-*

*tle* does not establish that Title VII claims do in fact involve "rights and remedies of the sort traditionally enforced in an action at law[,]" *Pernell v. Southall Realty, supra*, but it seems to caution the trial courts against assuming that they do not.

Taken together, the Supreme Court's recent cases suggest that statutory causes of action giving rise to individual claims for money damages are rarely, if ever, beyond the reach of the Seventh Amendment. If the Bankruptcy Code cannot be regarded as an inherently non-jury statute, it makes little sense to assume that ERISA involves exclusively equitable claims. Just as the Court in *Lytle* declined to assume that Title VII is wholly equitable, so we reject the notion that ERISA is intrinsically equitable or that its purposes would be frustrated by the advent of jury trials.

Quite apart from the implied statutory right to a jury trial discussed above, recent Supreme Court jurisprudence in the area of ERISA also compels us to conclude that the Seventh Amendment extends to a wide variety of disputes over entitlement to money. *Firestone Tire and Rubber Company v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), for example, implies that contests over the meaning of ambiguous plan provisions—the resolution of which often results in the recovery of money damages or a declaration as to whether money will be recovered in the future—more closely resemble legal than equitable claims.

Prior to *Firestone*, judicial review of the actions of ERISA trustees was limited to determining whether a plan fiduciary had acted arbitrarily and capriciously in breach of his statutory duty. This standard of review applied not only to the fiduciary's investment and management decisions but also to his interpretation of ambiguous provisions in the pension or employee welfare plan (*i.e.* whether money was, or would be, due to a participant). Recognizing that such review had been borrowed from equity, many courts quite naturally concluded that challenges to a fiduciary's interpretation of a pension or employee welfare plan are equitable proceedings to which the Sev-

enth Amendment does not apply. *See. e.g. Chilton v. Savannah Foods & Industries, Inc.*, 814 F.2d 620 (11th Cir.1987); *Brown v. Retirement Committee of Brigs & Stratton*, 797 F.2d 521 (7th Cir.), *cert. den.* 479 U.S. 1094, 107 S.Ct. 1311, 94 L.Ed.2d 165 (1986); *Wardle v. Central States, Southeast and Southwest Areas Pension Fund*, 627 F.2d 820 (7th Cir.), *cert. den.* 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981); *Calamia v. Spivey*, 632 F.2d 1235 (5th Cir.1980).

In *Firestone*, however, the Supreme Court rejected the arbitrary and capricious standard for Section 502 actions challenging denials of benefits based on plan interpretations. The Court held that in the absence of an express plan provision to the contrary, ERISA plans must be interpreted without deference to the views of the trustee. This not only comports with established principles of trust law, but it is consistent with the fact that prior to the enactment of ERISA, disputes over the appropriate interpretation of a particular pension or employee welfare plan were reviewed like "any other contract claim—by looking to the terms of the plan and other manifestations of the parties' intent." *Firestone*, 489 U.S. at ——, 109 S.Ct. at 954. As the Court framed the issue in *Firestone*, "[a]dopting [the trustee's] reading of ERISA would require us to impose a standard of review that would afford less protection to employees and their beneficiaries than they enjoyed before ERISA was enacted." *Id.* This would make no sense in view of ERISA's commitment to " 'promot[ing] the interests of employees and their beneficiaries,' " *id.* (quoting *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983)), and " 'protect[ing] contractually defined benefits,' " *id.* (quoting *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 148, 105 S.Ct. 3085, 3093, 87 L.Ed.2d 96 (1988)). Accordingly, the Court concluded that "for purposes of actions under [ERISA], the *de novo* standard of review [of a trustee's interpretation] applies regardless of whether the plan at issue is funded or unfunded and regardless of whether the administrator or fiduciary is

operating under a possible or actual conflict of interest." *Id.* 489 U.S. at ——, 109 S.Ct. at 955. *See also Kinek v. Gulf & Western, Inc.,* 720 F Supp. 275, 282 (S.D.N.Y.1989) (Sand, J.) (in light of *Firestone,* the *de novo* standard applies to "contract dispute[s] in which plaintiffs and defendants offer alternative, and conflicting, readings of two provisions in [an ERISA] plan").

In *Firestone,* the Supreme Court held that disputes over the proper interpretation of ERISA plans are best treated as contractual litigation among interested parties. Not only did the Court acknowledge that ERISA actions differ substantially from one another, but it implied that many such actions implicate rights and remedies of the sort traditionally enforced in an action at law. The present action is such a case. In alleging discriminatory interference with rights defined by private agreement, plaintiffs here raise at least two discrete issues involving mixed questions of fact and law: (1) what were plaintiffs' rights under the Policy; and (2) to what extent, if any, did defendants interfere with those rights? That the allegedly discriminatory or tortious conduct interfered with *past* or *vested* rights—*i.e.* rights as of the date that Mrs. Vicinanzo was terminated—does not change the fundamentally *prospective* focus of this lawsuit. Any judgment against defendants for interference with past rights likely would include, by necessary implication, an adjudication of ongoing or future rights to money benefits. As noted earlier, in the absence of the stipulation to continue payments during the pendency of this action, plaintiffs would now be seeking a money judgment for benefits past due. We can conceive of no reason in law or logic why they should forfeit their constitutional right to a jury trial merely because they have stipulated to a continuation of benefits and sought what amounts to a declaratory judgment as to their future rights.

In short, the initial issues that must be resolved in this litigation concern the nature and extent of plaintiffs' rights under the Plan, as reflected in the Policy. Even if these issues are only "incidental" to equitable claims—and they are not—the Seventh Amendment compels us to provide a jury trial on the underlying (or, in this case, antecedent) claims of legal entitlement. *See Dairy Queen, Inc. v. Wood, supra; Local 391, supra.* We therefore decline to strike plaintiffs' jury demand on constitutional as well as statutory grounds.

Defendants' motions are denied.

SO ORDERED.